**ASSATEAGUE ISLAND CONDEMNATION CASES OPINION NO. 1.**

**UNITED STATES of America**

v.

**222.0 ACRES OF LAND, MORE OR LESS, IN the COUNTY OF WORCESTER, STATE OF MARYLAND, R. C. L. Moncure, Executor of the Estate of Charles H. Grogan, Deceased, et al.**

**Civ. Nos. 19510, 19884.**

United States District Court
D. Maryland.
Nov. 6, 1969.

Anthony C. Liotta, Philip M. Zeidner and Naneita A. Smith, Attys., Lands Division, Dept. of Justice, Washington, D. C., and Stephen H. Sachs, U. S. Atty., and Jean G. Rogers, Asst. U. S. Atty., Baltimore, Md., for plaintiff.

Franklin Goldstein, Arnold Michael Weiner and Burke, Gerber & Wilen, Baltimore, Md., and J. Hampton Baumgartner, Jr., Bruce S. Mencher and Wilkes & Artis, Washington, D. C., for Trustees of the Liquidation Trust for former members and stockholders of Ocean Beach Club, Inc., and for Assateague Island Bridge Corp.

Raymond S. Smethurst, Jr., Salisbury, Md., for Assateague Island Realty Corp.

Louis Friedman and Miles & Friedman, Baltimore, Md., for Ocean Beach, Inc., and South Ocean Beach, Inc.

THOMSEN, Chief Judge.

Assateague Island, a long, thin strip of land off the eastern shore of Maryland and Virginia, has the Atlantic Ocean on the east and the Sinepuxent and Chincoteague Bays on the west. The northern part of the Island is in Worcester County, Maryland, the southern part in Accomack County, Virginia.

In 1965 Congress decided to acquire Assateague Island for a National Seashore. P.L. 89–195, 79 Stat. 824, 16 U.S.C.A. § 459f et seq. The government thereafter filed a series of land condemnation proceedings in this Court, the first of which was filed on April 27, 1967.[1] At the time of the taking more than 2,000 persons and corporations owned lots on the Island with the right to use the beaches, roads, and certain other facilities. Many troublesome questions have arisen, and all the cases have been consolidated.

*The Issues Considered in This Opinion*

Because of disputes (A) between some of the parties with respect to the owner-

[1.] The authority for the taking of the defendants' land is the Act of Congress approved August 1, 1888, as amended, 25 Stat. 357, 40 U.S.C.A. § 25, and the Act of Congress approved September 3, 1964, 78 Stat. 897, 16 U.S.C.A. §§ 460*l*–4 to 460*l*–11, the Department of Interior and Related Agencies Appropriation Act, 1968, 82 Stat. 429, and the Act of September 21, 1965, 79 Stat. 824, and all other acts amendatory thereof and supplementary thereto.

ship rights in certain platted lots and other property, part of which had been created by dredging and filling in Sinepuxent Bay, referred to collectively herein as the causeway property, and (B) between the government and those parties with respect to the nature and extent of their property interest in the land-fill portion of the causeway property, a separate trial of those issues has been held before the Court without a jury. Testimony has been taken, and oral and written arguments have been considered. This opinion contains findings of fact and conclusions of law on those issues.

### Findings of Fact

#### The Persons and Corporations Interested in the Issues

1. Ocean Beach, Inc., and South Ocean Beach, Inc. (collectively, Ocean Beach), of which Leon Ackerman was the president and sole stockholder, were the developers of a large part of the Island. Ackerman and his licensed salesmen also acted from time to time as brokers in the sale of lots on the Island owned by other persons and corporations. Ackerman died in 1965.

Taylor B. Bryan, Ackerman's right hand man, was secretary of all the Ackerman companies, and was a director of the Bridge Corporation, referred to in Finding 3 below.

2. Ocean Beach Club, Inc. (the Club) was incorporated in 1955 at the instigation of Ackerman. The members of the Club were property owners on the Island.

Title to the beach, streets and parks in the central portion of the Island was deeded to the Club by Ocean Beach "as community property [or "as community ocean beach property" or "as community parks"] for the benefit of all present and future owners of record of property situate on Assateague Island, in Worcester County, Maryland, for the mutual use and benefit of all of said property owners and their heirs, personal representatives and assigns", subject to the right of

Ackerman and his assigns to approve the location of and plans for the construction of any pier in the area designated as "pier site" on the plats.

The owners of all or most of the lots had also acquired easements, implied easements or rights to use the beach and other community property. The nature and extent of such easements, and the rights of various claimants in some of the land condemned will be considered in a separate opinion after a further hearing.

The Club undertook certain maintenance and other duties, and collected dues and assessments from the owners of many of the lots. The Club was liquidated on January 22, 1968, and Henry Burke, Bernard S. Denick and A. Fred Freedman were appointed Trustees in Liquidation of the Club.[2]

3. Assateague Island Bridge Corporation (the Bridge Corporation) was incorporated in Maryland on March 15, 1955, for the purpose of constructing and operating a bridge from the mainland of Worcester County to Assateague Island.

Ackerman was instrumental in the formation of the Bridge Corporation. The Club was the sole holder of its common stock, but hundreds of persons bought shares of its preferred stock. The Bridge Corporation acquired certain lands, obtained certain permits, and engaged in dredging and filling operations to create an adequate causeway as an approach to the proposed bridge on the island end. It was unable to complete the bridge, and in January 1968 Messrs. Burke, Denick and Freedman (see note 2) became Trustees in Liquidation of the Bridge Corporation.

4. Assateague Island Realty Corporation (the Realty Corporation), of which Robert C. Walker was Vice-president and a 50% stockholder, owned land on the Island. Walker served as an engineer for the Bridge Corporation and others, and engaged in various other activities set out below. He died in 1966.

---

2. Freedman has since resigned and been replaced by Arthur C. Strasburger as Trustee.

5. North Ocean Beach, Inc., the stock of which was held 50% by Ackerman and 50% by Walker, owned land in the northern portion of the Island.

### The Agreements and Deeds in Question

6. Shortly after the Bridge Corporation was organized in March 1955, several possible sites for the bridge were considered. One of the sites had its island abutment at a place where Ocean Beach owned the land. Ocean Beach also owned some of the land across Sinepuxent Bay suitable for the western abutment of such a bridge.

7. To aid the financing of the bridge, an agreement was entered into on June 7, 1955, among Ackerman, Ocean Beach and the Bridge Corporation, in which Ackerman agreed:

(a) that he would cause to be conveyed to the Bridge Corporation certain lots in North Ocean Beach, so that they could be sold by the Bridge Corporation to finance the construction of the bridge, provided specified conditions were met. Those conditions included the requirement that a contract for the construction of the bridge be let and that the bridge be at least 50% completed before December 31, 1956. The deed for the North Ocean Beach lands was to be held in escrow and returned to the grantor if the conditions were not met; and

(b) that "if the site which is finally chosen would cause the bridge to terminate on property to which he or any of his corporations hold title on the Island, or on the mainland, that he will cause to be conveyed to the Bridge Corporation land adequate for approaches therefor without cost to the Bridge Corporation". The agreement of June 7, 1955, placed no conditions on the transfer to the Bridge Corporation of the land, referred to in this paragraph (b), to be used for the approaches to the bridge.

8. On June 4, 1955, a letter had been prepared for signature by Ackerman as President and Bryan as Secretary of Ocean Beach, in which Ocean Beach agreed, at the request of Walker, to transfer to the Bridge Corporation the mainland and island approaches to the proposed bridge. The last paragraph of that letter read as follows:

"It is mutually understood and agreed by all parties hereto that this agreement to dedicate and convey * * * is predicated upon and contingent upon their use within a specified time as bridgeheads and for necessary fills and approaches thereto and also subject to recapture or repossession by Ocean Beach Inc. in the event of failure on the part of the Assateague Island Bridge Corporation or its successor or assigns to actually commence construction of the bridge between these two parcels of land prior to July 31, 1956."

The proposed letter of June 4, 1955, was never signed. It was prepared and preserved by Walker, who referred to it in his testimony before the Public Service Commission in 1961. See Finding 30.

9. (a) By deed dated June 14, 1955, pursuant to paragraph (b) of the agreement of June 7, 1955, quoted in Finding 7, above, Ocean Beach conveyed to the Bridge Corporation in fee simple approximately 32 acres of marsh and meadowland on Assateague Island, which, together with the subsequent fill constitute the causeway property. The "together" clause contained the words "together also with riparian rights appurtenant thereto".

(b) On the same day, by another deed, but pursuant to the same agreement, Ocean Beach conveyed to the Bridge Corporation in fee simple seven acres of land, more or less, on the mainland, at or near South Point.

(c) Both of those deeds were recorded on June 17, 1955, and neither of them contained any condition or any limitation on the use to which the property conveyed was to be put.

10. On June 15, 1955, a joint meeting of the Board of Governors of the Club and the Board of Directors of the Bridge Corporation was held. Two approaches on the Island and three approaches on

the mainland were considered. The minutes of that meeting show:

(a) that Marshall B. Diggs, an attorney and Chairman of the Board of the Bridge Corporation, "explained that the Bridge Corporation has accepted from Ocean Beach Inc. land for right-of-ways and approaches on the mainland and on the Island. The property has been deeded. Deed has been prepared returning to Ocean Beach, Inc., the land on the Island in the case the Bridge is at some other point. Ocean Beach Inc. is making a gift of the land on the mainland to the Bridge Corporation even though the bridge might be at some other point"; and

(b) that a motion was made "that the deed returning the land on the Island to Ocean Beach Inc. if not used for the bridge be executed by the President and Secretary of the Bridge Corporation. Motion was seconded by Colonel Burroughs. There was no opposition and it was so ordered."

Major General Harry McK. Roper, U.S. A. Ret., who as President of the Bridge Corporation, and Taylor B. Bryan, who was secretary of Ocean Beach and a director of the Bridge Corporation, were the only persons present at the meeting of June 15, 1955, who testified at the hearing in this Court. Both of them testified that the land was not to revert to Ocean Beach if the bridge was not completed, provided that site was selected and the necessary approval for a bridge on that site was obtained from the Public Service Commission.

11. A deed reconveying to Ocean Beach in fee simple the 32 acres of land on the Island, together with riparian rights appurtenant thereto, was executed by the Bridge Corporation on June 15, 1955. It was intended that this deed be held in escrow by the Title Guarantee Company, but it was apparently delivered to and remained in the possession of Ocean Beach until it was recorded among the land records of Worcester County on December 6, 1968, after the death of both Ackerman and Walker, and after the condemnation proceedings had begun.

12. On March 9, 1956, Ocean Beach conveyed to the Realty Corporation various properties on Assateague Island, including "marginal acreage   *   *   * deeded to the Assateague Island Bridge Corporation, for a proposed bridgehead and access road thereto, if recovered by or conveyed back to Ocean Beach Inc. because of a default on the part of the Bridge Corporation, or a decision to locate the proposed bridge elsewhere *   *   *."

13. The site using the land on the Island conveyed to the Bridge Corporation by Ocean Beach on June 14, 1955, was finally selected by the Bridge Corporation before the end of June 1955.

*The Dispute between the Trustees and the Realty Corporation*

The dispute between the Liquidating Trustees of the Bridge Corporation on the one hand and the Realty Corporation, representing any possible interests of itself, Ocean Beach, and the Ackerman and Walker estates, on the other is with respect to the condition or conditions upon which the 32-acre-tract, now part of the causeway property, was conveyed by Ocean Beach to the Bridge Corporation on June 14, 1955; or, as the Realty Corporation would state it, the condition or conditions upon which the deed of June 15, 1955, from the Bridge Corporation reconveying the property to Ocean Beach would become effective between the parties.

The Trustees contend that the only condition upon which the 32 acres covered by the deed of June 14, 1955, was conveyed to the Bridge Corporation by Ocean Beach was that the land so conveyed be finally selected by the Bridge Corporation as the site for its bridge. The Bridge Corporation therefore contends that the deed of June 15, 1955, reconveying the property to Ocean Beach never became effective.

The Realty Corporation admits the existence of a condition, but contends that

the condition was the completion of the bridge on that site, and that since the bridge was not completed, title to the 32 acres passed to Ocean Beach under the deed of June 15, 1955, and to the Realty Corporation under the deed of March 9, 1956.

A finding somewhere between those suggested by the Trustees and by the Realty Corporation respectively, based upon the testimony of General Roper and Taylor Bryan and supported by other evidence, is also possible.

### The Government's Position

The government takes no position with respect to the controversy between the Trustees and the Realty Corporation, but challenges their contention that one or the other of them has a fee simple title to the 28 acres of land created by the dredging and filling, subject only to the paramount rights of the United States with respect to navigation and navigable waters. The government contends that the State either owns or has certain rights with respect to the land created by the fill.

### The Necessary Approvals

Article 23, §§ 140 to 143 of the Annotated Code of Maryland (1957) deal specifically with corporations formed for the erection of bridges or the construction of canals. Section 140 requires a bridge corporation to obtain the consent of the appropriate county commissioners to the construction of a bridge over any river, creek or stream of water in the State. Section 143 provides that "[N]o bridge shall be erected on a navigable river, unless authorized by the State Roads Commission of Maryland".

Article 78, §§ 2, 23 and 24, of the Maryland Code, require that the Public Service Commission of Maryland approve the construction and financing of a toll bridge.

Approval of the Secretary of the Army on recommendation of the Chief of Engineers is required for dredging and filling in navigable water. 33 U.S.C.A. § 403.

Section 525(b) of Title 33 requires that the location and plans for bridges over navigable waters of the United States "shall be approved by the Chief of Engineers and the Secretary of the Army before construction is commenced, and, in approving the location and plans of any bridge, they may impose any specific conditions relating to the maintenance and operation of the structure which they may deem necessary in the interest of public navigation, and the conditions so imposed shall have the force of law."

### Additional Findings of Fact Obtaining the Necessary Approvals

14. Walker, as engineer for the project, prepared plans for the Bridge Corporation showing the design and construction of the proposed bridge. The plans clearly indicated that a causeway would be constructed for the island approach by dredging and filling. The Bridge Corporation embarked promptly on all necessary steps to obtain the required approval from various governmental agencies.

15. The Board of County Commissioners of Worcester County approved the location of the proposed bridge on August 2, 1955. On December 29, 1955, the Maryland State Roads Commission approved the construction of the bridge.

16. (a) On August 9, 1955, Walker submitted to the Department of the Army an application for a permit to dredge and fill, accompanied by a chart showing the location of the proposed dredge and fill. The permit was granted by the Secretary of the Army on September 7, 1955, subject to the following pertinent condition: "(f) That if future operations by the United States require an alteration in the position of the structure or work herein authorized, or if, in the opinion of the Secretary of the Army, it shall cause unreasonable obstruction to the free navigation of said water, the owner will be required upon due notice from the Secretary of the Army, to remove or alter the structural work or obstructions caused thereby without ex-

pense to the United States, so as to render navigation reasonably free, easy, and unobstructed; and if, upon the expiration or revocation of this permit, the structure, fill, excavation, or other modification of the watercourse hereby authorized shall not be completed, the owners shall, without expense to the United States, and to such extent and in such time and manner as the Secretary of the Army may require, remove all or any portion of the uncompleted structure or fill and restore to its former condition the navigable capacity of the watercourse. No claim shall be made against the United States on account of any such removal or alteration."

(b) In late 1955, the Bridge Corporation submitted an application, with plans, to the Department of the Army for approval of the proposed bridge. At Walker's request, the District Engineer for the Baltimore District of the Corps of Engineers stated in a letter dated December 29, 1955, his opinion that "the construction of the bridge as proposed in your application, will not unreasonably affect navigation".

(c) On January 20, 1956, the Chief of Engineers, U. S. Army, gave his formal written approval of the location and plans for the proposed bridge subject to the following pertinent conditions: (a) "All work shall be so conducted so that the free navigation of the waterway shall not be unreasonably interfered with, * * * " and (b) the approval granted "shall cease and be null and void unless the actual construction of the bridge be commenced within two years and complete within four years from the date of this instrument".

17. On July 20, 1955, the Public Service Commission gave the Bridge Corporation tentative approval to build the proposed bridge, but required the Bridge Corporation to submit more complete plans for the construction and financing of the bridge. Hearings were held before the Public Service Commission during January 1956, at which both Ackerman and Walker testified in support of the application of the Bridge Corporation. The plans for construction and design of the approaches, causeways, and the bridge itself were discussed. It was specifically brought out during Walker's testimony that the causeway would be about 560 feet in width, wider than required for a road leading to the proposed bridge, and that the Bridge Corporation could realize substantial funds through the sale of lots on the causeway.

After the hearings and after the necessary approvals had been obtained by the Bridge Corporation from the other governmental agencies, the Public Service Commission entered Order No. 52273 on May 21, 1956, authorizing the Bridge Corporation (a) to issue and sell 100,000 shares of 5% cumulative preferred stock at a $10 par value, the proceeds of such stock to be used for construction of the proposed bridge, and (b) to proceed with the construction, provided that a contract for the construction of the bridge was let within four months of the date of the order, and that work commence by December 31, 1956.

On August 23, 1956, the Public Service Commission wrote the Bridge Corporation that: "The required dredging and the building of the necessary causeway constitute essential parts of the project and the Commission considers that the award of a contract therefor is consistent with the requirement of the provision even though this work may be done by an organization separate from the one which may later be selected for the erection of the span itself.

18. The Bridge Corporation commenced constuction operations in the fall of 1956 by letting contracts for the causeway and the approaches to the bridge. By dredging and filling operations, the property on the Island which had been conveyed to the Bridge Corporation by Ocean Beach on June 14, 1955, was extended into Sinepuxent Bay.[3] By

---

3. Similar dredging and filling operations on the mainland are not involved in the present proceeding.

December 31, 1956, the dredging and filling were substantially completed at a cost to the Bridge Corporation of $175,000. Walker estimated the total cost of building the proposed bridge in 1956 to be about $960,000.

19. During 1957 and 1958 the Bridge Corporation engaged in other construction work, including core drilling, pile driving, and work on the abutments, but was unable to obtain the funds necessary to complete the bridge. In all, the Bridge Corporation spent $333,815.78 in connection with the construction of its proposed bridge.

20. In 1961 the Maryland General Assembly authorized funds for the construction of a bridge to Assateague Island at a place north of the causeway property. The Bridge Corporation thereupon abandoned its efforts to construct its proposed bridge.

*Financing the Work, and Actions by Ackerman, Walker, Ocean Beach and the Realty Corporation with Respect to the Causeway Property which Tend to Show their Intentions and Understandings*

21. In November 1955 the Bridge Corporation began its efforts to sell preferred stock in order to obtain part of the funds necessary to build the bridge. A prospectus filed with the Securities Exchange Commission became effective on November 4, 1955, before the final approval of the site by the Public Service Commission. The prospectus recited that the Bridge Corporation owned the 32 acres of land in "fee simple" and that:

"The following persons having a material relationship with the Bridge Corporation, own the following real estate on the island and on the mainland which may reasonably be expected to increase in value as a result of the construction of the proposed bridge:

"The Ocean Beach Companies, all of the stock of which is owned by Leon Ackerman, own approximately 640 salable lots situated in the Ocean Beach and South Ocean Beach developments on the island. In addition, these Companies own a considerable amount of land which is chiefly marshland fronting on the Sinepuxent Bay side, all of which needs to be reclaimed at a cost which cannot now be estimated."

22. A second prospectus, effective May 16, 1957, stated: (1) that $254,181.66 had been expended on the bridge to February 28, 1957; (2) that the causeway property, consisting of 28 acres of land created by dredging and filling, had been subdivided into 56 lots, which were not restricted to residential use, and represented "an asset of the Bridge Corporation available for sale"; and (3) that "[t]he Bridge Corporation has acquired fee simple title to the following tracts of land adequate and suitable for bridgeheads, approaches and connecting roadways for the Bridge Project on the mainland as well as on the Island, to be used only for these purposes. These tracts consist of the following: (i) Thirty-two acres of land situated on Assateague Island and acquired by gift from Ocean Beach, Inc.; (ii) Eight acres of land situated on the mainland and acquired by gift from Thomas F. Johnson and wife [and] (iii) Seven acres of land situated on the mainland and acquired by gift from Ocean Beach, Inc." Additional shares were sold after the second prospectus and some shares were issued to Walker for his services to the Bridge Corporation.

23. To increase the stock sales, Ackerman and the Bridge Corporation agreed on November 19, 1957, that Ackerman and his licensed salesmen would sell the preferred stock out of his Washington office without charge to the Bridge Corporation. A third prospectus, effective February 3, 1958, reflected Ackerman's sales function and required that all proceeds of sales made pursuant to the 1958 prospectus be held in escrow for return to subscribers if the proceeds proved insufficient to finance the

bridge.[4] Ackerman was unable to sell sufficient stock to raise the needed funds to complete the bridge, and in January 1960 that portion of the stock subscription funds which had been deposited in escrow was refunded to the subscribers, with interest at 5%.

24. All purchases of the Bridge Corporation's preferred stock were made between 1956 and 1960. The Bridge Corporation received $194,970 from 702 individuals in full payment for 19,497 shares of preferred stock. In addition, the Bridge Corporation received $7,030.83 from 48 individuals as partial payment on unpaid subscriptions for 1,960 shares. Almost all of the purchasers of preferred stock were lot owners on the Island.

25. Bryan, in his capacity as a director of the Bridge Corporation, aided in the preparation of each prospectus and kept Ackerman aware of the progress the Bridge Corporation was making in its financing efforts. Walker, who was the engineer for the Bridge Corporation, also prepared some of the material for each prospectus.

26. The 28 acres of land created by the dredging and filling, together with the 32 acres conveyed to the Bridge Corporation by Ocean Beach, were platted by Walker to create seven blocks of eight lots each between the two roads on the causeway leading to and from the proposed bridge, and six blocks outside the two roads. The plat was made in June 1957 under an arrangement made with Walker by Bryan and authorized by the governing boards of the Bridge Corporation and the Club.

27. In a letter to all Ocean Beach property owners dated July 12, 1957, Ackerman stated that "at the bridgehead and causeway on the Island side of the bridge, 56 choice commercial lots have been platted and are owned by the Bridge Corporation". Some of these lots were included in the 32 acres conveyed to the Bridge Corporation by Ocean Beach and some were created by the fill. Ackerman acted as broker for the Bridge Corporation in the sale of several lots located on the causeway property.

28. Walker also acted as a broker for the Bridge Corporation in selling those lots. On February 28, 1958, as broker for the Bridge Corporation Walker sold to Arthur Klinefelter 24 of the causeway lots with the understanding that Klinefelter would sell 12 of the lots to Walker personally. The latter transaction was consummated within a few months.

29. On or about July 5, 1958, Walker prepared a deed conveying the Town Hall site on the causeway property from the Bridge Corporation to the Club.

30. At the request of the People's Counsel, the Public Service Commission held a hearing on October 25, 1961, to determine the status of the authority granted to the Bridge Corporation on May 21, 1956. Walker, among others, testified, and in answer to a question as to who was going to derive the benefit from the sale of the causeway lots, said:

"A. I would say the Bridge Corporation and Ocean Beach Club, which have the same Directors, interlocking directorates, would share in that, and the sale of the property by the Assateague Island Bridge Corporation would yield a substantial refund against either outstanding stockholders or against the completion cost of the bridge, whichever is chosen."

In response to a question whether any deeds were in any way conditioned upon the building of the bridge, Walker replied

---

4. The third prospectus repeated the statements in the second prospectus with respect to the 56 lots available for sale and the ownership in fee simple of the 32 acres of land on the Island.

In each prospectus, under the heading "Description of Properties", it was stated that the properties which had been acquired for bridgeheads, approaches and connecting roadways were "to be used only for these purposes". A footnote to the section entitled "Statement of Assets and Capitalized Expense" stated that those properties had been donated "to provide suitable bridgeheads, approaches and connecting roadways * * * and for use for these purposes only."

that the land was donated by Ackerman specifically for the purpose of providing access and roadway approaches for the bridge; and that he did not know whether or not the land would revert to Ackerman "if the bridge is not built". Walker also read into the record the last paragraph of the "letter" from Ocean Beach (Ackerman) to the Bridge Corporation, dated June 4, 1955, set out in Finding 8, treating it as an authentic letter.

31. The construction work was paid for in part by the sale of preferred stock under the first and second prospectus, in part by advances from the Club, in part by the sale of real estate which had been conveyed to the Bridge Corporation by corporations in which Ackerman and Walker were interested, and in part by sale of lots on the causeway created by the fill.

32. During the existence of the Club and the Bridge Corporation, the Club made advances to or for the benefit of the Bridge Corporation. Repayments were made from time to time by the Bridge Corporation in cash and by transfers of land. At the time of liquidation of the two corporations (January 22, 1968), the Bridge Corporation owed a balance of $39,430.65 to the Club. The land that the Bridge Corporation had transferred to the Club to reduce its indebtedness on the advances were:

(A) Blocks 510, 410 and lots 5 through 12 in block 310, and the fuel dock site.

(B) The Town Hall site—1½ acres.

(C) South Point Property—7 acres located in Worcester County on the mainland. See Finding 9(b).

Walker and Ackerman were aware of those transactions, participated in them and raised no objections.

33. Neither Walker nor the Realty Corporation ever asserted any claim of ownership of the causeway as against the Bridge Corporation until after Walker's death in 1966, and after the condemnation proceedings in this case were filed. Nor did either Ackerman or Ocean Beach assert any such claim, either on their own behalf or on behalf of Walker or the Realty Corporation during Ackerman's lifetime purporting to reconvey the 32 acres to Ocean Beach. The deed of June 15, 1955 (see Findings 10 and 11) was recorded by someone representing Ocean Beach or the Realty Corporation in December 1968.

I.

*The Dispute Between the Bridge Corporation and the Realty Corporation*

*(A) Intention*

The deed of June 14, 1955, by which Ocean Beach conveyed to the Bridge Corporation 32 acres of land on Assateague Island, was recorded on June 17, 1955. Finding 9(a) and 9(c). The deed of June 15, 1955, reconveying to Ocean Beach the Island property included in the June 14 deed, was not recorded until December 1968.[5] Finding 11.

The fact that the June 15 deed was absolute on its face and delivered to Ocean Beach, the grantee, does not prevent the Bridge Corporation from showing that the delivery was conditional and that the conditions upon which the delivery was to become effective never occurred. The Court of Appeals has held that "it is the intention of the grantor of a deed that determines whether the delivery of the deed is absolute or conditional, although the delivery is made by the grantor directly to the grantee". Chillemi v. Chillemi, 197 Md. 257, 263–265, 78 A.2d 750, 753 (1951). The conduct of the parties may elucidate whether the delivery of the deed was absolute or conditional, and if conditional, the conditions

---

5. Under Maryland law, a deed conveying an estate in land for more than seven years must be recorded within six months of its date. Code, Art. 21, §§ 1 and 10. Late recording does not prevent a deed from being effective between the parties or against a purchaser with knowledge of the deed. Code, Art. 21, §§ 11, 12, 16. Zulver Realty Co. v. Snyder, 191 Md. 374, 383, 62 A.2d 276 (1948).

upon which the deed was delivered.[6] The burden of proof in this case is on the Bridge Corporation, the grantor, to show that the delivery was conditional and that the condition was not satisfied. *Chillemi,* supra.

Ocean Beach and the Realty Corporation do not deny that the delivery of the June 15 deed was conditional. The dispute between them and the Bridge Corporation is as to what the condition or conditions were.

### Ultimate Findings re Intention

The Court finds credible the testimony of General Roper and Taylor Bryan that the 32-acre tract conveyed to the Bridge Corporation by Ocean Beach on June 14, 1955, was not to revert to Ocean Beach, and that the delivery of the deed of June 15, 1955, was not to become effective simply because the bridge was not completed. They testified that the 32-acre tract was to remain the property of the Bridge Corporation and the deed of June 15 was not to become effective if the 32-acre tract was selected as the site for the Island approach and the necessary approvals for the bridge were obtained. After considering all of the evidence, the Court makes the following additional findings:

34. The conditions upon which the property covered by the June 14 deed was given by Ocean Beach to the Bridge Corporation, and conversely, the conditions which would prevent the deed of June 15 from becoming effective between the parties, were (1) that the 32-acre tract should be selected by the Bridge Corporation as the site for the Island approach, (2) that the proposed bridge at that site should be approved by the requisite public authorities, and (3) that the Bridge Corporation should commence and prosecute the work in good faith. This was the intention of the responsible officers of Ocean Beach and of the Bridge Corporation, respectively.

35. The site was selected promptly, all necessary approvals were obtained, and the Bridge Corporation began construction in good faith. The failure to complete the bridge was due to inability of the parties, including Ackerman and Walker, to raise the necessary funds. The coup de grace was given by the decision of the State in 1961 to build a bridge.

36. The intention of the parties with respect to the conditions upon which the 32-acre tract was conveyed to the Bridge Corporation by the June 14 deed and reconveyed to Ocean Beach by the June 15 deed, is supported by the acts and failures to act of the parties, set out in the Findings of Fact, above. By their acts and failures to act, Ackerman, Bryan, Ocean Beach, Walker and the Realty Corporation recognized that the Bridge Corporation owned the causeway property, and had the right to sell the lots on the causeway property to raise money for the needs of the Bridge Corporation.

### (B) Estoppel

The Trustees of the Bridge Corporation contend that the doctrine of estoppel gives them a second string to their bow.

Conduct of the parties may not only elucidate their intention at the time the deeds were executed and delivered, but may also amount to an estoppel, if the requirements of estoppel are met.[7]

### Ultimate Findings re Estoppel

37. By reason of their ownership of land on the Island or of stock in corpora-

---

6. No question of the construction of the language of the deed of June 14, 1955, or the deed of June 15, 1955, is involved. Both, on their face, convey absolute fee simple estates.

7. Those requirements are stated in many Maryland cases, and are not in dispute. See Travelers Indemnity Co. v. Nation-wide Construction Corp., 244 Md. 401, 414, 224 A.2d 285 (1965) ; Johnson Lumber Co. v. Magruder, 218 Md. 440, 447–448, 147 A.2d 208 (1958) ; Solomon's Marina, Inc. v. Rogers, 221 Md. 194, 156 A.2d 432 (1959). The facts in Solomon's Marina v. Rogers make that case particularly important here.

tions owning such land, Ackerman, Bryan, Ocean Beach, Walker and the Realty Corporation were interested in furthering the construction of a bridge, in the efforts being made to persuade persons to invest in the preferred stock of the Bridge Corporation and in having the Club, the sole holder of the common stock, advance money to the Bridge Corporation to be used for work on the causeway and other necessary expenses.

■ 38. The preferred stockholders of the Bridge Corporation who purchased their stock under the first and second prospectuses were entitled to rely upon the statement in each prospectus that the Bridge Corporation owned the causeway property and that the lots thereon were assets of the Bridge Corporation available for sale. Walker had platted these lots at the request of Bryan, Ackerman's right hand man. Walker and Ackerman, as well as Bryan, participated in the preparation of the prospectuses and knew what they contained. Ackerman, Ocean Beach, Walker and the Realty Corporation are estopped from claiming any ownership in the causeway property which would adversely affect the interests of the preferred stockholders.[8]

39. The estoppel rights of the Bridge Corporation itself, its creditors and its common stockholder (the Club) are less clear. The Club loaned money to the Corporation from time to time which was repaid in part by the transfer of property on the causeway. After the State decided to build a bridge, the Bridge Corporation continued to pay taxes on the causeway property which still stood in its name on the land records and the tax records, without any claim being made by Ackerman, Walker, Ocean Beach or the Realty Company, or anyone else, that such property no longer belonged to the Bridge Corporation. These facts may

be sufficient to support an estoppel. However, in view of the ultimate findings of this Court under the heading "Intention", above, it is not necessary to decide whether the acts and failures to act of Ackerman, Ocean Beach, Walker and the Realty Corporation amounted to an estoppel against them in favor of the Bridge Corporation, its creditors and its common stockholder.

### Conclusions

*Conclusion A.* The persons or corporations to whom the Bridge Corporation conveyed lots on the causeway property, including the Club, and the heirs, successors or assigns of such grantees, own such lots, subject to whatever rights the United States or the State of Maryland or both may have in such lots or in such portions thereof as were created by filling in Sinepuxent Bay in front of the 32 acres.

*Conclusion B.* The Trustees in Liquidation of the Bridge Corporation own the causeway property (except such lots as the Bridge Corporation has conveyed to purchasers or to the Club) subject to (1) whatever rights the United States or the State of Maryland or both may have in that part of the causeway property which was created by filling in Sinepuxent Bay in front of the 32 acres conveyed to the Bridge Corporation by Ocean Beach, and (2) whatever rights Worcester County or others may have in roads or other portions of the property arising by dedication or otherwise.

The nature of the title or interest of the Bridge Corporation and its assigns to the land created by dredging and filling, the rights of the United States with respect thereto, and any right, title or interest of the State of Maryland and Worcester County therein will be discussed below in Section II.

---

8. They do not claim any title adverse to the grantees of any causeway lots conveyed by the Bridge Corporation, some of which were purchased by Walker through Klinefelter.

## II

*The Nature of the Title and Interest of the Bridge Corporation and Others in that Part of the Causeway Property Created by Dredging and Filling in the Waters of Sinepuxent Bay*

In colonial times, under the Royal Charter, the Lord Proprietary held title to the soil beneath navigable waters in Maryland up to the line of mean high tide, and patented fee simple title to land under water to individuals, subject to the public rights of navigation and fishing.[9] As a result of the Revolution, the State succeeded to the rights of the Lord Proprietary and continued to issue patents for such land.[10]

■ Under Maryland law waters are considered navigable for the purposes of this rule if they are subject to the ebb and flow of the tide.[11] Some Maryland cases have suggested that waters should be considered navigable if they are navigable in fact, which is the federal test of navigability.[12] In the most recent case dealing with the question, Wagner v. Mayor and City Council of City of Baltimore, 210 Md. 615, 124 A.2d 815 (1956),

the Court of Appeals found it unnecessary to decide whether the ancient test should be abandoned. The waters of Sinepuxent Bay are navigable under either test.

The owner of fast land bordering on navigable water has a common law right to land formed by the gradual and imperceptible accretion of alluvion to the littoral land or by reliction.[13] But it has generally been held that the doctrine of accretion does not extend to land "reclaimed" by such owner through filling in land under water and creating new dry or fast land.[14]

The owner of land bordering on navigable water also has a common law right of access to the water in front of his fast land, to navigate, to fish, to bathe and to use the water for other purposes. To facilitate the exercise of that right, such owner has the right to erect piers and docks on the submerged public land beyond the water line in front of his fast land, and to wharf out over it, subject to federal and state regulation and control and with due regard to the rights of the public and adjoining land owners.[15]

9. Browne v. Kennedy, 5 Har. & J. 195 (1821); Day v. Day, 22 Md. 530 (1865); Sollers v. Sollers, 77 Md. 148, 151–152, 26 A. 188, 20 L.R.A. 94 (1892); Mutual Chemical Co. of America v. Mayor and City Council of Baltimore, 33 F.Supp. 881 (1940), aff'd in part, rev'd in part sub nom. Mayor and City Council of Baltimore v. Crown Cork & Seal Co., 122 F.2d 385 (4 Cir. 1941).

10. Mayor, etc., of City of Baltimore v. McKim, 3 Bland 453 (1831); Mutual Chemical Co. of America v. Mayor and City Council of Baltimore, supra; Mayor and City Council of Baltimore City v. Canton Co., 186 Md. 618, 630–631, 47 A.2d 775, 781 (1946).

11. Browne v. Kennedy, supra; Linthicum v. Shipley, 140 Md. 96, 98, 116 A. 871, 23 A.L.R. 754 (1922); Toy v. Atlantic Gulf & Pacific Co., 176 Md. 197, 4 A.2d 757 (1939).

12. City of Havre de Grace v. Harlow, 129 Md. 265, 98 A. 852 (1916); Gray v. Gray, 178 Md. 566, 16 A.2d 166 (1940); The Daniel Ball, 77 U.S. (10 Wall.) 557,

19 L.Ed. 999 (1870); United States v. Appalachian Electric Power Co., 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243 (1940).

13. Baltimore & O. R. R. Co. v. Chase, 43 Md. 23 (1875); Linthicum v. Coan, 64 Md. 439, 450, 2 A. 826 (1886); Causey v. Gray, 250 Md. 380, 243 A.2d 575 (1968).

14. Burns v. Forbes, 412 F.2d 995 (3 Cir. 1969); Sage v. New York, 47 N.E. 1096, 1103 (1897); Revell v. People, 177 Ill. 468, 52 N.E. 1052, 43 L.R.A. 790 (1898); Michaelson v. Silver Beach Improvement Ass'n, 342 Mass. 251, 173 N.E.2d 273, 275, 91 A.L.R.2d 846 (Mass.1961). It has been held that such an owner acquires title to accretions to his land created artificially by the acts of third persons in which he has no part. County of St. Clair v. Lovingston, 90 U.S. (23 Wall.) 46, 23 L.Ed. 59 (1874); The Edmondson Island Case, 42 F. 15 (D.Md.1890); Burns v. Forbes, supra.

15. Causey v. Gray, 250 Md. 380, 387, 243 A.2d 575 (1968); Hughes v. Washington,

Several acts of the Maryland Legislature and City ordinances, designed to encourage the development of Baltimore harbor, granted special rights to the owners of land fronting on the harbor.[16] Similar rights were granted to owners of riparian land in Port Deposit fronting on the Susquehanna River.[17]

In 1862 the Maryland Legislature enacted the following general law, still in effect, as Art. 54, §§ 45, 46 and 48 of the 1957 Code, granting certain rights to owners of riparian lands on navigable waters: [18]

"Whereas, Doubts are entertained in regard to the extent of the rights of proprietors of land bounding on navigable waters, to accretions to said land, and to extend improvements into said waters; for the purpose of solving such doubts, therefore,

"Section 1. *Be it enacted by the General Assembly of Maryland,* That article fifty-four of the Code of Public General Laws, be amended by adding thereto the following sections, to wit:

"Thirty-seven [45]. Accretion to land on navigable water.

"The proprietor of land bounding on any of the navigable waters of this State shall be entitled to all accretions to said land by the recession of said water, whether heretofore or hereafter formed or made by natural causes or otherwise, in like manner and to like extent as such right may or can be claimed by the proprietor of land bounding on water not navigable."

" *   *   *

"Thirty-eight [46]. Right to make improvements in front of land on navigable river.

"The proprietor of land bounding on any of the navigable waters of this State shall be entitled to the exclusive right of making improvements into the waters in front of his said land; such improvements and other accretions as above provided for shall pass to the successive owners of the land to which they are attached, as incident to their respective estates. But no such improvement shall be so made as to interfere with the navigation of the stream of water into which the said improvement is made.

" *   *   *

"Thirty-nine [48]. Patent not to affect riparian rights, nor issue for land covered by navigable waters.

"No patent hereafter issued out of the Land Office shall impair or affect the rights of riparian proprietors, as explained and declared in [present §§ 45 and 46], and no patent shall hereafter issue for land covered by navigable waters."

Since 1862, no patents have been issued for land covered by navigable water. The Board of Public Works (see Art. XII of the Constitution of Maryland and Art. 41, § 196 of the Code) is authorized to sell and convey real and personal property of the State of Maryland, including the inland waters of the State and land under those waters. Code, Art. 78A, § 15. No deed was ever obtained from the Board of Public Works for the land on which the fill involved in this case was made.

### Accretion

Black's Law Dictionary (4th ed.), p. 36, defines "accretion" as: "The act of growing to a thing; usually applied to

389 U.S. 290, 293–294, 88 S.Ct. 438, 19 L.Ed 2d 530 (1967); Burns v. Forbes, 412 F.2d 995 (3 Cir. 1969).

16. Acts of 1745, chapter 9; Acts of 1784, chapter 39. See also Giraud's Lessee v. Hughes, 1 Gill & J. 249 (1829); Baltimore & O. R. R. Co. v. Chase, supra; Cahill v. Mayor and City Council of Baltimore, 173 Md. 450, 196 A. 305 (1938).

17. Acts of 1824, chapter 33. See Tome Institute of Port Deposit v. Crothers, 87 Md. 569, 584, 40 A. 261 (1898).

18. The numbers of the sections in the 1957 Code have been inserted in brackets after the numbers of the corresponding sections of the Code of 1860, to which those sections were added by the Act of 1862, chapter 129. The section headings are those in the 1957 Code.

the gradual and imperceptible accumulation of land by natural causes, as out of the sea or river".[19] None of the parties has argued that the 28 acres of filled land involved in this case was an "accretion".

*Conclusion C.* The land created by the fill is not an accretion within the meaning of Art. 54, § 45.

### Improvements

There has been no unanimity about the meaning of the term "improvements" in § 46. The decisions of the Court of Appeals of Maryland are conflicting.

In Goodsell v. Lawson, 42 Md. 348 (1875), both the Circuit Court and the Court of Appeals indicated that they considered new land created by dumping oyster shells off the land of riparian owners by a tenant of the owners to be an "improvement" within the meaning of § 38 of the 1862 Act, now § 46 of Art. 54. The Circuit Court said that if the fill had been accomplished by the riparian owners themselves, "no one would have questioned their title". 42 Md. at 360. The Court of Appeals said: "By the Code, Art. 54, sec. 38, there is secured to them as riparian proprietors, the exclusive right of making improvements into the waters in front of their lands, and such improvements when made belong to them as incident to their estate". 42 Md. at 371.

Subsequent cases in the Court of Appeals indicate that the word "improvements" embraces only structures such as wharves, piers, and docks. In Hess v. Muir, 65 Md. 586, 5 A. 540, 6 A. 673 (1886), the Court of Appeals discussed the meaning of "improvements", as used in § 38 (now § 46) of Art. 54, and concluded:

"The improvements, which under section 38, a proprietor of land bounding on navigable waters, is entitled to make into the same, and which with the other accretions provided for, shall pass to the successive owners of the

land, to which they are attached as incident to their respective estates, are plainly, we think, such structures as are subservient to the land, and which used in connection with the land, enhance its value or enlarge its commercial or agricultural facilities, or other utility, to an extent the land alone would be incapable of, and in this way 'improve' it. They are to be made 'into' the water,—a term inconsistent with entire separation from the land. Wharves, piers and landings are examples of such improvements." 65 Md. at 598, 5 A. at 542.

In a separate opinion Judge Alvey said:

" * * * The right given to improve out from the shore into the water was designed, manifestly, to embrace only structural improvements, such as wharfs, piers, warehouses, or the filling out from the shore, and reclaiming the land from the inundation of the water. * * * It is very clear, I think, that the legislature never intended, by anything in the act of 1862, (chapter 129,) to disturb, or in any manner restrict, the common right of fishery, farther than the structural improvements, when made, might be an obstruction to the exercise of that common right." 65 Md. at 603, 6 A. at 674.

The uncertain state of the Maryland law is shown by two opinions from the Attorney General's office [20] and by the discussion of earlier cases in Hodson v. Nelson, 122 Md. 330, 335–343, 89 A. 934 (1914). The most recent case in the field, Causey v. Gray, 250 Md. 380, 243 A.2d 575 (1968), dealt with a dispute between two riparian owners, and did not decide the meaning of the word "improvements" in Art. 54, § 46. That case will be considered more fully below.

In the last few years there has been much legal and political discussion in Maryland of the questions: (1) whether a riparian owner has a statutory right under Art. 54, § 45 or § 46, artificially

19. For a full discussion of the meaning of "accretion", see 50 Op.Atty.Gen. of Md. 452, at 460–464.

20. 50 Op.Atty.Gen. 452 (1965) and 52 Op. Atty.Gen. 324 (1967).

and deliberately to fill the land under navigable water in front of his fast land, thus creating more fast land; (2) who owns the new land thus created, as between the State and the riparian owner; (3) if it is owned by the riparian owner, what is the nature of his title to the new land; and (4) may the Legislature terminate, abrogate or restrict by regulation such right, title or interest, without paying compensation therefor.[21]

The Deputy Attorney General attended the hearing in this case and advised the Court that the State did not wish to appear as a claimant herein because the Attorney General did not consider this to be an appropriate case, nor indeed this Court to be an appropriate forum, in which to settle the questions set out above with respect to the State's rights in filled land. He felt that the questions should be presented to the State courts in a case not complicated by the unusual facts discussed below.

*Unusual Circumstances of this Case*

It is not necessary to decide in this case the four general questions set out in the next to last paragraph above. This Court is dealing with a special set of facts, including actions by various State agencies not present in the ordinary situation. Therefore, it is not necessary to decide whether Art. 54, § 46, without more, gave the Bridge Corporation the right to create new fast land by dredging and filling. In this case there was more.

Art. 23, §§ 140–143 of the Code, which deal with "Companies for the Erection of Bridges or Construction of Canals", require, inter alia, that a bridge corporation receive approval to construct a bridge from the appropriate county commissioners, and, if the bridge is erected on a "navigable river", from the State Roads Commission. The Bridge Corporation obtained those approvals after having submitted plans and designs plainly showing that it intended to create, by dredging and filling, approximately 28 acres of new fast land to be used as a causeway to the proposed bridge.

██ Because the proposed bridge was to be a toll bridge, the Bridge Corporation was required to obtain the prior authorization of the Public Service Commission before it could legally issue any stock. Art. 78, §§ 2, 23, 24(b) (5). Art. 78, § 24(c) provides in pertinent part: "Subject to the additional requirements set forth in the following subsections of this section, the Commission may authorize any of the acts enumerated in subsection (b) [including the issuance of stock], upon a finding that to do so is consistent with the public convenience and necessity."

Authorization for the issuance of the preferred stock was obtained after the Bridge Corporation had submitted to the Public Service Commission the plans for the proposed bridge, including the causeway, and a plan for financing the construction not only from the sale of preferred stock, but also from the sale of lots on the causeway, including the portion thereof to be created by dredging and filling.

██ *Conclusion D.* The authorizations given by the County Commissioners, the State Roads Commission and the Public Service Commission (see Findings 15 and 17), pursuant to the statutes cited above, amounted to State action authorizing the creation of the 28 new acres of fast land by dredging and filling, for the purposes specified in the applications and approvals.

██ *Conclusion E.* The permission given by the United States for the dredging and filling, which resulted in the creation of the 28 acres of new land, contained the condition set out in Finding 16(a), above. The proper officials of the United States, therefore, in the exercise

---

21. In certain situations the questions may be affected by such statutes as the Acts of 1745 and 1784 dealing with land facing on Baltimore Harbor, or chapter 690 of the Acts of 1965, creating the Worcester County Shoreline Commission, providing for bulkhead lines, shorelines or fill lines, none of which apply in this case.

of its right to control and protect navigation and navigable waters, could require at any time that the fill and any improvements thereon be removed without compensation to any owner thereof. All cases, State as well as Federal, recognize the paramount right of the United States to control and protect navigation and navigable waters. See, e. g., Causey v. Gray, 250 Md. 380, 387, 243 A.2d 575 (1968); United States v. Rands, 389 U.S. 121, 122–123, 88 S.Ct. 265, 19 L.Ed.2d 329 (1967); Hawkins Point Light-House Case, 39 F. 77 (D.Md.1889).

■ *Conclusion F.* In view of the actions referred to in Conclusion D, taken pursuant to legislative authority, particularly the authorization of the Public Service Commission for the sale of lots on the causeway for the financing of the construction of a public service project, the persons who purchased such lots from the Bridge Corporation in good faith own such lots, subject only to the paramount rights of the United States to protect navigation, referred to in Conclusion E, above, and to the right of the State to condemn land for a public purpose. Such persons hold a base fee, i. e., a determinable or qualified fee.

*Conclusion G.* The portions of the causeway property platted for roads were conveyed by the Bridge Corporation to Worcester County, and are owned by that County, subject to the paramount rights of the United States, set out in Conclusion E. The Court intimates no opinion at this time as to whether such a deed was necessary to establish ownership by the County of the platted roads on the causeway.

■ *Conclusion H.* With respect to the portions of the 28 acres which were not sold (including the site for a Town Hall conveyed by the Bridge Corporation to the Club), the failure to complete the bridge meant that such unsold land would not be used for the purpose for which the authorizations of the County Commissioners, the State Roads Commission and the Public Service Commission were granted. Nevertheless, in view of the facts (1) that the several agencies granted such authorizations pursuant to legislative authority, (2) that the preferred stockholders purchased stock in the Bridge Corporation under prospectuses which recited the financing arrangements approved by the Public Service Commission (including the sale of lots on the fill to help finance construction), and (3) that the Bridge Corporation and its creditors (including the Club) spent or advanced money in good faith for the construction of the causeway as an integral part of the proposed bridge, the 28 acres created by the dredging and filling should be considered "improvements" under Art. 54, § 46 or the equivalent of such improvements.

It is necessary, therefore, to consider the nature of the title of the Bridge Corporation to those portions of the 28 acres to which it holds record title; and of the Club to those portions to which it holds record title.

In Causey v. Gray, 250 Md. 380, 243 A. 2d 575, the most recent opinion of the Court of Appeals in this area, the Court said, at page 387, 243 A.2d at page 581:

"* * * When the statutory law grants the right to a riparian owner to extend his lot or to improve out to the limits prescribed by the public authorities, the riparian owner receives a 'franchise—a vested right, peculiar in its nature but a *quasi* property of which the lot owner cannot be lawfully deprived without his consent.' B. & O. R. R. Co. v. Chase, 43 Md. 23, 36 (1875). When the lot owner makes improvements in front of his lot, complete title then vests in him in the improvements provided it is in front of his lot and does not appropriate the riparian rights of his neighbors. B. & O. R. R. Co. v. Chase, 43 Md. at 36–37."

In Baltimore & O. R. R. Co. v. Chase, the Court of Appeals was dealing not with the general Act passed in 1862, but with the Act of 1745, ch. 9, which was intended to encourage improvements on the water fronts of the harbor of Baltimore

**156**

for the convenience and accommodation of commerce. As an inducement, the State surrendered to riparian owners who made improvements as contemplated by the Act all rights as sovereign in the bed of the river covered by such improvements, below the ordinary water mark, and "declared that such improvements should be forever deemed the right, title and inheritance of such improvers, their heirs and assigns forever". 43 Md. at 36. The provisions of the 1745 Act were limited to Baltimore Harbor and are differently worded from the provisions of the general law enacted in 1862, now Art. 54, §§ 45, 46 and 48 of the Code, quoted above. Section 38 of that Act, now § 46 of Art. 54, states that "such improvements and other accretions as above provided for shall pass to the successive owners of the land to which they are attached, as incident to their respective estates". Nevertheless, in Goodsell v. Lawson, 42 Md. 348, a case involving what is now § 46, the Court of Appeals said:

> "The Code provides that such improvements 'shall pass to the successive owners of the land to which they are attached, as incident to their estate'. It does not follow from this, that the title to the improvements when made, may not be severed from that of the mainland, and be conveyed to and held by other persons having no interest in the original tract. The right of the riparian proprietor to such improvements, necessarily carries with it such power of alienation as owner thereof." 42 Md. at 373.

This statement does not appear to have been overruled, but it should be noted that in none of the Maryland cases which have been cited or found did any official of the State intervene to claim that the state had any right to the improvements. The Court of Appeals has, however, recognized the State's interest in protecting not only navigation, but also fishing and crabbing rights in navigable waters.[22]

*Conclusion I.* Although the Maryland law with respect to the title to improvements made under Art. 54, § 46 is not entirely clear, this Court concludes that under the circumstances of this case, particularly those referred to in Conclusion H, above, the Bridge Corporation and the Club should be considered to own that part of the 28 acres to which they hold record title, subject only to the paramount rights of the United States to protect navigation, referred to in Conclusion E, above, and to the right of the State to condemn land for a public purpose. The Bridge Corporation and the Club have a base fee, i. e., a determinable or qualified fee in the filled land to which they respectively hold title.

---

22. Delmarva Power & Light Co. of Maryland v. Eberhard, 247 Md. 273, 276, 230 A.2d 644 (1967); Mayor, etc., of Baltimore v. Baltimore & Philadelphia Steamboat Co., 104 Md. 485, 493–494, 65 A. 353 (1906); Hess v. Muir, 65 Md. 586, 606–609, 5 A. 540, 6 A. 673 (1886).