**ASSATEAGUE ISLAND CONDEMNA-TION CASES OPINION NO. 2**

**UNITED STATES of America**

v.

**CERTAIN LAND Situate IN the COUNTY OF WORCESTER, STATE OF MARYLAND, and Ocean Beach Inc., a Maryland corporation, et al.**

**Civ. Nos. 19510, 19884.**

United States District Court,
D. Maryland.

April 3, 1970.

THOMSEN, Chief Judge.

These consolidated condemnation cases were brought pursuant to an Act of Congress establishing the Assateague Island National Seashore, which embraces the whole of Assateague Island (Assateague) and adjacent small marsh islands and water areas. P.L. 89–195, § 1 et seq., September 21, 1965, 79 Stat. 824, 16 U.S.C.A. §§ 459f to 459f–10.

Assateague is 35 miles long and ranges between one-third of a mile and two miles in width, with 22 shoreline miles in Maryland and 13 in Virginia. The northern part is separated from the mainland by Sinepuxent Bay, the rest by Chincoteague Bay. The northernmost six miles of Assateague consists of two large tracts of land, as to which no condemnation proceedings have . yet been filed, and which are not involved in the present controversy. Immediately south of those tracts is a state park, two miles long, established by Maryland in the early 1960s. These condemnation cases deal with the next fourteen miles, from the state park to the Virginia line, consisting almost entirely of two developments known as Ocean Beach and South Ocean Beach (collectively, Ocean Beach).

The present opinion [1] considers (A) the claims of various parties to have some right, title and interest in and to certain areas referred to as the beach, parks, parking areas, streets, pier site, harbor site, fuel dock and town hall site, and (B) whether any or all of those areas have more than a nominal value for condemnation purposes. The term "beach", as used herein, means the land lying between the mean high water mark of the ocean and the platted lots fronting thereon.

A hearing was held to determine those issues. Notice of the hearing was given

Anthony C. Liotta, Philip M. Zeidner, Naneita A. Smith and Stanley J. Fineman, Attys., Lands Division, Department of Justice, Washington, D. C., and Stephen H. Sachs, U. S. Atty., and Jean G. Rogers, Asst. U. S. Atty., Baltimore, Md., for plaintiff.

Franklin Goldstein, Arnold Michael Weiner, and Burke, Gerber & Wilen, Baltimore, Md., and J. Hampton Baumgartner, Jr., Bruce S. Mencher, and Wilkes & Artis, Washington, D. C., for Trustees of Liquidation Trust for former members and stockholders of Ocean Beach Club, Inc., and for Assateague Island Bridge Corporation.

Louis Friedman and Miles & Friedman, and Howard E. Wallin, Baltimore, Md., for Ocean Beach, Inc., and South Ocean Beach, Inc.

Jeremiah D. Griesemer, Temple Hills, Md., for Thomas F. and Helen S. Corcoran.

1. Opinion No. 1 in these cases, 306 F.Supp. 138 (D.Md.1969), dealt with ownership rights in certain platted lots and other real property, referred to as the causeway property, part of which had been created by dredging and filling in Sinepuxent Bay, and with the nature and extent of the property rights in the land-fill portions of the causeway property. Findings 1–3 therein, at p. 141, set forth the identity of various persons and corporations mentioned in the present opinion who were involved in the efforts to develop the Ocean Beach and South Ocean Beach subdivisions.

to all owners of property involved in the condemnation cases and they were invited to participate. Several dozen owners appeared in person, a few by counsel, and various claims and contentions were presented by (1) the Trustees of the Liquidation Trust for the Former Members of Ocean Beach Club, Inc., (2) Thomas F. Corcoran et ux., the owners of several residential lots, and (3) Ocean Beach, Inc., and South Ocean Beach, Inc. (the developers).

All counsel agreed that each owner of a lot purchased from either of the developers (whether such owner purchased the lot directly from the developer or obtained it from a mesne owner) has an implied appurtenant easement to use the beach, the streets and the parks. The Government contends that the value of that implied appurtenant easement was a part of the value of such owner's lot or lots for condemnation purposes, and that because of the easements and for other reasons discussed below, the beach, the parks, the streets and other public or community property have only a nominal value for condemnation purposes. The Trustees, the Corcorans and the developers all contend that these properties have more than nominal value for condemnation purposes, although they disagree as to who is entitled to collect such claimed value.

### Findings of Fact

#### Plats

1. Most of the land involved in these cases had been platted into lots and blocks for subdivision purposes in 1950–1952 by the developers, which were controlled by Leon Ackerman. All of the plats were filed and recorded among the land records in the office of the Clerk of the Circuit Court for Worcester Coun-

ty.[2] A dozen or so parcels along Sinepuxent and Chincoteague Bays, most of which were owned and used by hunting clubs, were never owned by the developers and were not part of the subdivisions.

2. All contracts of sale entered into by the developers were by lot and block numbers, and all deeds to the purchasers described the property conveyed by lot and block numbers on specific recorded plats. Most of the lots were in areas designated on the plats as "private, one-family houses, restricted residential zone". Interspersed were areas designated on the plats as "business and commercial, multi-family residences" or as "business or commercial and multi-family zoning". Almost all of the lots were 100 feet wide by 200 feet deep.

3. All areas and parcels of land involved in the recent hearing and dealt with in this opinion appeared on the original, revised or amended plats. Those areas and parcels are:

A. *The Beach*—All of the plats showed a beach area between ocean-front lots and the ocean. Some plats contained the following language: "South Ocean Beach and adjoining subdivision Ocean Beach, Maryland, hereby dedicate and provide over fifteen (15) miles of ocean shore reserved for the future use and benefit of all lot owners". Other plats did not contain explicit language of reservation, but merely showed an "ocean beach". On each plat, two narrow dotted lines labeled "Projected Boardwalk" ran along the length of the commercial lots fronting on the beach.

(B) *Parks and Parking*—The plats for all sections designated as "Parks" two or three blocks entirely surrounded by commercial areas.[3]

2. The plats of five sections of the Ocean Beach subdivision were filed in 1950: "A", "B", "C", "D", and "E". The plats of three sections of the South Ocean Beach subdivision were filed in 1952: "1", "2", and "3". Amended or revised plats for all sections in both subdivisions were filed, the last being an amendment

to Section A required by the platting of the lots on the causeway property created by dredging and filling in 1956. See Opinion No. 1, Finding No. 18, 306 F. Supp. at 145–146.

3. In the original and revised plats of Section A, filed in 1950, three adjacent areas were designated as "Parks" and a sepa-

(C) *Boulevards and Streets*—All plats showed streets and other highways.

(D) *Pier Site*—A small area adjacent to residential areas facing the ocean was designated on the 1950 plat of Section A as "Reserved Pier Site", and on the 1957 amended plat as "Community Pier Site".

(E) *Harbor Site*—An area fronting on Sinepuxent Bay was designated on the 1950 plat as "Harbor Site Reserved". On the 1957 amended plat this area was divided and designated as "Public Harbor" and "Harbor Parking".

(F) *Fuel Dock*—A small area in Section A projecting into a "Dredged Harbor" on Sinepuxent Bay was designated "Fuel Dock" on the 1957 amended plat.[4]

(G) *Town Hall Site*—The town hall site was located on the causeway property created in 1956 by the dredging and filling operations of the Bridge Corporation, and first appeared on the 1957 amended plat of Section A.

### Promotion, Sales and Deeds

4. The development was promoted by full-page advertisements in Washington and Baltimore newspapers and by brochures distributed from Ackerman's Washington office. The early advertisements referred to "8 miles of beautiful private beach reserved for the use of property owners and their guests". When additional land was offered, the advertisements stated: "Ocean Beach is a community beach, not a public beach. Every property owner will enjoy unlimited use of the entire 15 miles of beach." A typical brochure, containing a platted map of the entire subdivision, states: "All property owners and their guests will enjoy unlimited use of the entire 15 miles of beach. * * * Commercial and business sites have been completely

segregated from residentially-zoned areas to the mutual advantage of both."

The developers represented to prospective purchasers that they would be given the use of a private beach available only to lot owners. That was the "keynote of their advertising." [5]

5. Sales were usually made on an installment basis. Many of the installment contracts were assigned by the developers to finance companies; deeds to the lots covered by the assigned contracts were usually given to title holding companies, which gave deeds to the purchasers after the price was paid in full. The deeds to the lots, whether from the developer or the holding companies, contained numerous conditions and restrictions, which varied somewhat from time to time.

6. Some 2586 deeds to lots or groups of lots in the subdivisions were issued by the developers or by the holding companies. The great majority of those deeds, about 2250, were to individual purchasers (including husbands and wives, brothers and sisters, etc.) and contained various covenants and restrictions, including the following or others generally similar thereto.

"9. The provisions herein contained shall run with and bind the land and inure to the benefit of and be enforceable by Ocean Beach, Inc., or the owner of any land included in said tract, and the failure by Ocean Beach, Inc., or any land owner to enforce any restriction, condition, covenant or agreement herein contained shall in no event be deemed a waiver of the right to do so thereafter, as to a default occurring prior or subsequent thereto; and the declared invalidity of any one or more of the provisions

---

rate block was designated "Central Park". The areas which had been designated "Parks" were re-designated on the 1957 amended plat as six "Parking" areas with a street between them.

4. That area was part of the 32-acre tract conveyed in the deed of June 14, 1955 to the Bridge Corporation by the developers.

See Opinion No. 1, Finding No. 9, 306 F. Supp. at 142. On the 1957 amended plat, which was signed by the Bridge Corporation as well as the developers, the area is cross-hatched with lines which designate it for commercial use.

5. Taylor Bryan, former Vice President and Secretary of the developers, so testified.

herein shall not affect the validity of the others.

"10. Any or all of the rights and powers, titles, easements and estates reserved or given to Ocean Beach, Inc., in this deed may be assigned by it to any one or more individuals, corporations or associations that will agree to assume said rights, powers, duties and obligations and carry out and perform the same. Any such assignment or transfer shall be made by appropriate instrument in writing in which the assignee or transferee shall join for the purpose of evidencing his or its acceptance of such rights and powers; and such assignee or transferee shall thereupon have the same rights and powers and be subject to the same obligations and duties as are herein given to and assumed by Ocean Beach, Inc.

"11. The Purchaser covenants to pay to Ocean Beach, Inc., on March 1st, of each year the sum of five dollars ($5.00) for each and every lot purchased, to be used for property maintenance.

"  *  *  *

"13. All of the above covenants and restrictions shall remain in force until July 1, 1960, and shall be automatically successively renewed for each ten-year period thereafter, unless owners of at least two-thirds of the lots in the subdivisions known as Ocean Beach shall, at least six (6) months prior to any such renewal date, agree in writing to a change in or abrogation of any of the above restrictions and conditions, and record such writing so amending the aforesaid covenants.

"14. Ocean Beach, Inc., reserves the right to modify the above restrictions and conditions in any case in which, in its discretion, it deems such modification necessary or advisable in connection with improvements to be erected on two or more adjoining lots."

The remaining 250 or so deeds differed in various respects, particularly in regard to covenant No. 11, quoted above.[6]

### The Clubs

7. All contracts of sale contained the following provision or one essentially similar thereto:

"This contract shall be subject to the Purchaser's application for membership in the Ocean Beach Club being approved by the Membership Committee. In the event of disapproval, this contract shall be cancelled and the deposit made by the Purchaser shall be returned."

At first no such club existed, and the formal applications for membership, signed by the prospective purchaser and

6. Some of the earliest deeds contained a provision requiring that:
"At such time as Ocean Beach, Inc., its successors or assigns, may form an association of the purchasers and owners of the lots in this subdivision for the purpose of administering the beach maintenance fund, each purchaser or owner expressly agrees to join and maintain membership in such association."
Some deeds to individual lot owners, although not expressly requiring the grantee to join an association of purchasers and owners, contained the following provision:
"This property cannot be assigned except on the condition that the assignee is acceptable for membership in the South Ocean Beach Club."
The deed conveying a group of lots to a corporation for eventual resale contained the following provision:

"Assateague Island Realty Corporation is hereby exempted from the provision and covenant requiring individual purchasers of lots to agree to pay to South Ocean Beach, Inc., or to its assignee or its designee or transferee, on March 1st of each year, the sum of five dollars for each and every lot purchased, to be used for property maintenance, as the lots granted and conveyed under this deed are for contemplated resale by the said corporation. However, the provision and covenant requiring individual purchasers of lots to agree to pay to South Ocean Beach, Inc., or to its assignee, or to its designee, or transferee, on March 1st of each year, the sum of five dollars for each and every lot purchased, to be used for property maintenance, shall apply to individual purchasers of lots designated herein from Assateague Island Realty Corporation, its successors and its assigns."

accompanied by an "application fee" of $5.00, were "approved" or "not approved" by Ackerman or someone designated by him purporting to act "For the Membership Committee".[7] The "application" was a device for screening the purchasers. An unincorporated club existed in the early 1950s, but lot owners were not required to pay dues to it; few if any of them participated, and the club did not engage in any activities material to the issues under consideration. The $5.00 application fee was retained by the developers until Ocean Beach Club, Inc. was incorporated in 1955, when the developers turned over $11,000 to it, representing the $5.00 "application fee" collected from 2200 purchasers.

8. In February 1955 a group of 26 lot owners, selected by Ackerman, met to organize Ocean Beach Club, Inc., as a Maryland membership (non-stock) corporation (the Club, Inc.). Articles of Incorporation were filed on March 14, 1955, and approved the next day.

Article Third thereof provided: "The purpose for which the Corporation is formed is to operate a club without profit to any individual members."[8]

Article Seventh provided:

*Members of Corporation.* All persons who have acquired title to land or have contracted to acquire title to land from either Ocean Beach, Inc., or South Ocean Beach, Inc. as of the date of filing of these Articles of Incorporation, shall constitute the original members of the Corporation for the purposes of any Maryland statutory provision relating to nonstock corporations. The Board of Governors shall have the power from time to time to fix the qualifications of members of the Corporation and the conditions upon which persons may continue to be or become members of the Corporation, and only those persons who comply with such qualifications and con-ditions shall constitute the members of the Corporation for purposes of the statutory provisions of the Maryland Corporation Law. One-third of the members of the Corporation shall constitute a quorum for the transaction of business."

The Board of Governors was authorized by Article Tenth to delegate any or all of the powers of the Board to two or more Governors constituting an Executive Committee.

The pertinent provisions of the By-Laws read:

"Article III: Membership in Ocean Beach Club, Inc.

"Section 1. Members

"All persons who have acquired or are acquiring title to land on the plats entitled 'Ocean Beach, Inc.,' (Maryland) and 'South Ocean Beach, Inc.', (Maryland) recorded among the land records of Worcester County shall be eligible to apply for membership in the Club as members.

"Section 2(a)

"The Board of Governors shall have the power from time to time to fix the qualifications of members of the Club and conditions upon which persons may continue to be or become members of the Club.

"Section 3. Term of Membership

"Membership shall remain in force so long as a member maintains his current status by payment of Club dues, complies with other requirements of Club membership and remains current on payment of beach maintenance fees and other assessments approved by the membership.

"Section 4. Dues

"Annual dues for both General and Associate Members shall be fixed from time to time by the Board of Governors."

---

7. Some contracts referred to the South Ocean Beach Club, although no such club was organized. Ackerman was president of the developer corporation. See Opinion No. 1, 306 F.Supp. at 145–146.

8. The Club, Inc. was vested with the broad corporate powers granted to all corporations by Art. 23, § 9 of the Maryland Code.

9. After the incorporation of the Club, Inc., the contracts of sale continued to include the provision set out in Finding 7 above. The form of application for membership was changed so that the application would be made to the Club, Inc. Otherwise, the form of the application and approval by someone "For the Membership Committee" remained the same. The $5.00 application fees were taken into the treasury of the Club, Inc. and used for the purposes set out in Finding 12 below, along with other moneys which the Club, Inc. received.

10. Some of the lot owners joined the Club, Inc. and paid all of the dues and assessments thereafter made. Others joined the Club, Inc. and paid some of the dues and assessments. Others never joined the Club, Inc. and never paid any dues or assessments. Several corporations besides the developers have owned blocks of lots from time to time. No corporate lot owner has ever been a member of the Club, Inc. nor paid any dues levied by the Club, Inc., although some corporate lot owners have paid the $5.00 maintenance fee required by the covenant in the deeds for the lots. See finding 6, above.

### Transfers from the Developers to the Club, Inc.

11. By the end of 1955 the developers had sold over 90% of the lots in the two subdivisions, and Ackerman wished to move on to other areas and to relieve the developers from their responsibilities to the lot owners.[9] He therefore caused the following action to be taken:

A. At the meeting of the newly organized Club, Inc. on July 6, 1955, Bryan reported that "Mr. Ackerman is ready to convey the beach, parks, etc., (property which has been dedicated), whenever the Club is ready to accept the responsibility in connection with such property. It is his thought that particularly at this time in connection with the beach, it might be advisable for the Club to be owners of record in case inquiry came up during the Hearing."[10]

B. On February 13, 1956, the developers (Ocean Beach, Inc., and South Ocean Beach, Inc.) executed substantially identical deeds conveying to the Club, Inc. legal title to (1) the 14-mile strip of beach, (2) the parks (including the area in Section A later designated as "parking")[11] and the pier site, and (3) the boulevards and streets and the projected right-of-way for a dual-lane highway.

The Habendum clauses in the deed from Ocean Beach, Inc., provided:

"TO HAVE AND TO HOLD the parcel of land hereinabove firstly described, unto the said OCEAN BEACH CLUB, INC., its successors and assigns, in fee simple, to be held by said Ocean Beach Club, Inc., its successors and assigns, as community ocean beach property, for the benefit of all present and future owners of record of property situate on Assateague Island, in Worcester County, Maryland, for the mutual use and benefit of all of said property owners and their heirs, personal representatives and assigns.

"TO HAVE AND TO HOLD the parcels of ground hereinabove secondly described, unto the said OCEAN BEACH CLUB, INC., its successors and assigns, in fee simple, to be held by said Ocean Beach Club, Inc., its successors and assigns, as community

9. As Taylor Bryan, former Vice President and Secretary of the developers, put it: "You can't live with a dead dog. * * *."

10. As noted in Finding 4, Bryan was Secretary of the developers, and Ackerman's "right-hand man". See Opinion No. 1, 306 F.Supp. at 141. The hearing referred to was a hearing before the Public Service Commission.

11. Three small areas were designated as parks on the plats of Section A, Revised of Ocean Beach, and as parking areas on the plats of Section A, Amended, which ran a street through those areas. The deed from Ocean Beach, Inc. to the Club, Inc. conveyed the areas marked "parks" on Section A, Revised, so it conveyed the areas in question.

parks and community pier site, for the benefit of all present and further owners of record of property situate on Assateague Island, in Worcester County, Maryland, for the mutual use and benefit of all of said property owners and their heirs, personal representatives and assigns, subject, however, to the right of Leon Ackerman to approve the location of and plans for the construction of any pier in the area designated as 'pier site' on the Plats hereinabove referred to, this right so reserved in Leon Ackerman may be assigned by him, by proper instrument recorded among the Land Records of Worcester County, to any person or corporation of his choice.

"TO HAVE AND TO HOLD all of those areas designated and laid out as Boulevards and Streets and as the projected right of way for Dual Lane Coastal Highway, together with any improvements thereupon and the rights, alleys, ways, privileges, appurtenances and advantages to the same belonging or in any wise appertaining unto the said OCEAN BEACH CLUB, INC., its successors and assigns, in fee simple, to be held by said Ocean Beach Club, Inc., its successors and assigns, as community property for the mutual use and benefit of all present and future owners of record of property situated on Assateague Island, in Worchester County, Maryland, for the mutual use and benefit of all of said property owners and their heirs, personal representatives and assigns."

C. Each developer also assigned to the Club its right under the deeds to the purchasers to receive from the individual lot owners an annual fee of $5.00 per lot for beach and property maintenance.[12] This assignment was accepted by the Board of Governors of the Club and ratified at an annual meeting on February 10, 1956.

*Later Acquisitions and Activities of the Club, Inc. and Others*

12. The Club, Inc. used the $11,000 which it received from the developers in 1956,[12a] the annual $5.00 maintenance fees [13] and the dues and assessments [14] received by it to purchase bulldozers and other land vehicles, a small boat, lawnmowers, an electric saw, and other equipment, to acquire and install snow fences in the sand dunes, to employ persons to care for and maintain the beach, to obtain insurance, to make some road repairs, to maintain the signs indicating that the area was private property, to subsidize the lot owners' use of the ferry, to maintain a club office in Washington, and for other purposes.

13. The Club, Inc. was actively interested in obtaining a bridge from the mainland to Assateague. The activities of various persons and corporations, including the Club, Inc. and Assateague Island Bridge Corporation, in which the Club, Inc. owned all the common stock, in planning and attempting to finance the construction of a toll bridge are set out in the Findings of Fact in Opinion No. 1, 306 F.Supp. 138,[15] and need not be repeated here.

14. On November 26, 1957, the Bridge Corporation conveyed to the Club, Inc. in fee simple Blocks 510, 410 and lots 5 through 12 in block 310, and the fuel dock site. There is nothing on any plat or in any deed to indicate that the fuel dock was public or community property.

15. On July 9, 1958, the Bridge Corporation conveyed to the Club, Inc. in fee simple the area on the causeway known as the Town Hall site. The deed provided that the "parcel of ground hereby granted and conveyed was reserved and designated on the above referenced Amended Plat of Section 'A' of Ocean Beach, Maryland, as 'Site for Town Hall' and its transfer to Ocean Beach Club,

12. See covenant 11 in Finding 6 and n. 6.

12a. See Finding 7.

13. See Findings 6 and 11(C).

14. See Finding 8.

15. See particularly Findings Nos. 3 to 39 inclusive, at pp. 141–150.

Inc., is specifically for that purpose and Park use."

16. Some 50 houses were constructed in the subdivision and a roadway was built, but in 1962 a severe storm destroyed most of the houses. The damage caused by the storm was so great that the resources of the Club, Inc. were insufficient to restore the only road which had ever been built or to maintain the necessary means of beach stabilization.

17. In 1962 Ackerman sold his entire interest in the developers to Pruitt and Trimper, Inc. The developers then held title to a considerable number of unsold lots and the irregular tracts designated as "Public Harbor" and "Harbor Parking" on the 1957 amended plat of Section A.

18. In 1961 the State decided to build a public bridge from the mainland to Assateague, which was completed in 1964. The financing of that bridge was accomplished by a contribution of $500,-000 from the State Roads Commission and $500,000 from Worcester County. The Worcester County contribution was achieved by a special tax assessment on Assateague Island property, which is still being paid annually by those lot owners whose property has been condemned by the United States but for which no declaration of taking has been filed.

19. Sometime before May 1963 the County Commissioners of Worcester County, in planning for the future development of the County, had considered the needs of Assateague and had decided that it was desirable for the County to obtain a deed for the roads, streets and park areas shown on the plats filed by the developers. Accordingly, the County Commissioners caused their attorney to get in touch with representatives of the Club, Inc., the Bridge Corporation and the developers in order to obtain a deed or deeds for those areas. The Club, Inc. and the Bridge Corporation agreed to convey those areas to the County, and the attorney for the County Commissioners prepared a deed which was executed by the Club, Inc. and the Bridge Corporation on May 20, 1963, and duly recorded, conveying to the County in fee simple those parcels of land designated on the plats as "parks", "parking", "boulevards" and "streets", including the streets known as "Central Park North" and "Central Park South",[16] but specifically excluding from the conveyance "Central Park" and the "Pier Site". The deed also excluded the area designated on the original plat of Section A as "Harbor Site Reserved" and on the 1957 amended plat as "Public Harbor" and "Harbor Parking", which had not been conveyed to the Club by the developers. The developers refused to execute a deed conveying any interest they might have in the properties conveyed by the Club, Inc. and the Bridge Corporation.

After the Club, Inc. executed the deed, the county engineer surveyed the areas so conveyed and laid out benchmarks for the construction of a main road, but the State obtained an injunction against the construction of the road. By then, the possibility that the government might

---

16. The deed contained so-called covenants and agreements relating to the developments of the roads. In subparagraph (a) the grantee was given discretion as to the selection of the time it deemed reasonable and proper to construct the public roads, streets and boulevards, and it was stated that the grantee did not obligate itself to do so at any specific time. In subparagraph (c) the grantee agreed not to improve, surface or resurface any portion of the streets described in paragraph 2, in the east and west direction, east of the westerly side of the ocean front lots binding upon said streets, if it would interfere with the erection or maintenance or stabilization of any sand dunes or protective erosion works, unless it would further the stabilization or protection thereof. Subparagraph (d) provided that the grantee should use at the time desirable or feasible, in its discretion, the areas described in paragraph one for parking areas and/or parks. The deed also provided that the grantee have and hold the "said parcels * * * unto and to the proper use and benefit of the said County Commissioners of Worcester County, Maryland * * *."

condemn the land for a national seashore was well known.

A suit was instituted in the Circuit Court for Worcester County challenging the validity of the conveyance by the Club, Inc. of the parks and parking areas included in the deed of May 20, 1963. The prosecution of that suit was enjoined by this Court pending the outcome of the condemnation litigation. All questions of title to the property condemned will be decided in these condemnation proceedings.[17]

20. On September 21, 1965, Congress passed the Assateague Island National Seashore legislation, referred to in the first paragraph of this opinion. The statute authorized the Secretary of the Interior to acquire lands, waters and other property "by donation, purchase with donated or appropriated funds, exchange, or in such other method as he may find to be in the public interest". 16 U.S.C.A. § 459f–1.

Offers for the purchase of individual lots began about September 1966. In July 1967 condemnation proceedings were initiated by the United States against a portion of Section A of Assateague.

Since January 1968 the Government has filed condemnation actions (including Civil No. 19884, the so-called "perimeter" suit) for all of the lots and other areas in the two subdivisions known as Ocean Beach and South Ocean Beach. Declarations of taking have been filed only in the condemnation actions for Sections A, B and C.

### The Liquidation Trust

21. In December 1967 the governors of the Club, Inc. and the directors of the Bridge Corporation proposed to the members of the Club, Inc. and to the holders of preferred and common stock of the Bridge Corporation that both corporations be liquidated and dissolved under Maryland law, and that the property and assets of each corporation, subject to any and all liabilities, be transferred to Henry G. Burke, A. Fred Freedman and Bernard S. Denick as Trustees of a Liquidation Trust, who would act under the terms of a proposed Liquidation Trust Agreement. A meeting to act upon the recommendations was called for January 22, 1968. It was further proposed that each member of the Club, Inc. assign to the Trustees of the Liquidation Trust his interest in such property and assets. There were 2586 members of the Club, Inc. on the basis of ownership of lots acquired from the developers, of whom 1456 were considered by the governors to be members in good standing entitled to vote. The remaining 1130 were delinquent two years or more in their dues and maintenance charges. A "proxy and authorization" form was sent to all 2586, and all were urged to sign the "authorization", even though they were not in good standing. The Corcorans were among the members who signed the proxy and authorization.

The recommendations of the governors of the Club, Inc. and of the directors of the Bridge Corporation were duly ratified at the January 22, 1968 meeting, and the Liquidation Trust Agreement was executed by the proxy-attorneys for the members of the Club, Inc. and the stockholders of the Bridge Corporation, and by the Trustees.

The Liquidation Trust Agreement is an elaborate document which need not be described in detail. The primary object of the Trust is "to liquidate trust assets by collection of receivables and by sale or through condemnation by any Federal Governmental agency or department; to satisfy the administration expenses of the Trust and outstanding debts of the corporations which are de-

17. United States v. Atomic Fuel Coal Company, 383 F.2d 1, 3 (4 Cir. 1967) ; Trustees of Internal Improvement Fund of Florida v. Southwest Tampa Storm Sewer Drainage Dist., 142 F.2d 637, 639 (5 Cir.), cert. den. 323 U.S. 732, 65 S.Ct. 69, 89 L.Ed. 587 (1944) ; United States v. Certain Land in City of Fort Worth, 232 F.Supp. 611, 612 (N.D.Tex.1964), aff'd Danciger v. City of Fort Worth, 354 F. 2d 689 (5 Cir. 1966).

termined to be bona fide charges against the assets received by the Trust; to distribute the divisible shares of the Trust to the beneficiaries entitled thereto; * * *." It provides for three Trustees and a Protective Committee selected by the Beneficiaries. The term "Beneficiary" was defined as follows:

*1.4. Beneficiary*—Any person, who, prior to the liquidation of the Beach Club, was a member thereof and any person who, prior to the liquidation of the Bridge Corporation, was the holder of either 5% Cumulative Preferred Stock or Common Stock thereof, shall be designated a 'beneficiary' under this Agreement, provided that an executed Authorization is retained by the Trustees for such person. However, the rights of a beneficiary under this Agreement shall be subject to any offsetting claims or debts due the Beach Club or the Bridge Corporation for unpaid dues, assessments, maintenance charges, unpaid subscriptions or other unsatisfied obligations. Furthermore, the interest of each beneficiary shall be subject to the class of beneficiaries in which each shall qualify and to the legal and equitable rights arising out of the corporate acts of the Beach Club and the Bridge Corporation from which these assets are received."

The Beneficiaries were divided into three classes: (a) Beach Club Class, consisting of those beneficiaries who were former members of the Beach Club, (b) Bridge Corporation Preferred Class, and (c) Bridge Corporation Common Class.

The term "member" was defined as: "A 'member' is a person who was a member of record of the Beach Club on the date upon which the plan of liquidation was adopted, and who is determined by the Protective Committee to be entitled to participate in the divisible share for the Beach Club Class."

The Trust Agreement provided for Marshaling of Assets, and contained the following provision:

"Method of Accounting—The designated accountant or accounting firm shall prepare a statement of financial condition at the close of each calendar year on the cash basis, except that the receivables due for unpaid dues, assessments and maintenance charges received by the Trustees shall be entered as an asset and a corresponding credit, unless waived by Trustees, shall be reflected in the Financial Statement. * * *"

Under the heading "Distribution of Trust Property", it provided: "The amount and method of such distributions shall be determined by the Trustees with the consent of the Protective Committee."

22. Articles of Transfer to the Trustees of the Liquidation Trust, transferring and conveying all property and assets of the Club, Inc., subject to any and all liabilities existing thereon, were executed on January 30, 1968, by the appropriate officers of the Club, Inc., and by the Trustees, and were duly recorded.

23. The Government paid into the Registry of this Court $56,900 for certain properties previously owned by the Club, Inc., and $113,100 for certain properties previously owned by the Bridge Corporation. The Trustees withdrew the funds so deposited, but have not settled with the Government.

24. The Trustees have also asserted liens against the amounts payable by way of settlement or award to any property owners who were delinquent in the payment of the $5.00 yearly maintenance fee called for by the deeds (see Finding 6 above) or the dues and assessments levied by the Club (see Finding 8 above).

25. After various preliminary proceedings had emphasized the marshaling and other problems faced by the Trustees, they filed a petition in these consolidated cases praying that this Court assume jurisdiction over the Liquidation Trust and supervise the ad-

ministration thereof.[18] For the reasons set out in the petition of the Trustees, see note 18, this Court assumed jurisdiction over the Liquidation Trust.

26. Shortly thereafter, the Corcorans filed a motion herein contending that the deeds by which the developers had conveyed the beach, the streets, the parks and the pier site to the Club, Inc., as community property, for the use and benefit of all present and future property owners on Assateague (see Finding 11 above), created a trust for which there is now no trustee, since the Club, Inc. has been dissolved. The Corcorans therefore asked the Court to appoint a substitute or successor trustee.

### Discussion, Ultimate Findings and Conclusions

The issues to be decided at this time with respect to each of the areas discussed below are: I. whether such area has more than a nominal value for con-

demnation purposes, and II. who is entitled to collect such value.

### I.

### The Beach and the Pier Site

■ Under Maryland law, beach property may be privately owned down to the high water mark. The portion of the beach between the high and low water marks is owned by the State, and is open to the public whenever it can be reached and used. Opinion No. 1 herein, 306 F.Supp. at 151.

The "beach" with which we are concerned in this case, therefore, is the area 14 miles long and usually about 200 feet wide, between the mean high water mark and the easternmost tier of lots.

■ The plats did not dedicate or offer to dedicate the beach to the public or for public use. Neither the developers nor their successors in title ever intended such a dedication.[19] Neither the County

---

18. The petition of the Trustees alleged, inter alia:

"11. This Court will be required to consider the rights of all lot owners involved in the consolidated cases to use the properties conveyed from Ocean Beach, Inc. to the Club as set forth in Paragraph 4 hereof and to consider what compensation is to be paid to whom, individual lot owners and/or Trustees, with respect to such rights of the lot owners.

"12. In order to resolve the various issues set forth above, it will be necessary for this Court to determine who were the members of Ocean Beach Club, Inc. It will be necessary for this Court to determine how many of the lot owners are entitled to participate in any amount recovered by the Trustees for the Club. It will be necessary for this Court to consider the respective rights of the former common stockholder and the former preferred stockholders to the assets of the Bridge Corporation which are involved in these consolidated cases.

"13. The questions set forth above which this Court will have to decide in order to resolve the issues involved in condemnation, and which must be decided by this Court since condemnation is a federal question, require this Court to resolve all of the major issues involved in the administration of the Liquidation Trust by the Trustees.

"14. All of the persons having any interest in the determination of the above questions are either parties to the consolidated cases or have sold under threat of condemnation any property which they owned on Assateague Island, Worcester County, Maryland, to the United States of America. Those persons who have sold to the United States of America still may, as former members of the Club and as beneficiaries of the Liquidation Trust, have an interest in the funds realized by the Trustees.

"15. Your Petitioners contend that in order to avoid any multiplicity of actions and unnecessary expense to all of the parties, it is in the interest of equity and justice that all of the relevant issues be decided in the one consolidated case.

"16. The Petitioners further contend that under the doctrine of 'ancillary' jurisdiction or the doctrine of 'pendent' jurisdiction, this Honorable Court has authority to exercise jurisdiction over the Trust and to supervise its administration in order to have the one court which has jurisdiction over the federal question decide the case in its entirety and to avoid having the same issues determined at different times and by different courts."

19. See Toney Schloss Properties Corp. v. Berenholtz, 243 Md. 195, 204–205, 220 A. 2d 910, 914 (1966); State Roads Com-

nor the State ever took any action to accept a possible dedication.[20] No public use of the beach destroyed its private and community character.[21] The developers and the Club, Inc. posted signs to indicate the private nature of the beach.

The plats, the advertisements and the deeds gave to the owner of each lot on Assateague purchased from the developers an implied easement, appurtenant to his lot, to use as a private beach the entire 14 miles of beach shown on the plats.[22] See, particularly, Findings 2, 3A, 4 and 6.

The value of that easement is reflected in the value of each individual lot, which the owner of such lot is entitled to recover, either by an award in this proceeding or by sale to the Government.[23]

That easement also gave each owner the right to prevent the use of the beach by the developers, by any lessee of the developers or of the Club, Inc., or by anyone else as a public beach or for any commercial purpose inconsistent with the rights of the owners of the lots to have the use of the entire beach as a private beach.[24]

Some lots on each plat, including some lots fronting on the beach or on a proposed boardwalk, were designated as being in a commercial area, or an area which permitted multi-family dwellings, in which apartments presumably could be rented to tenants. But the beach opposite the commercial lots was not excepted from "the entire 14 miles of beach" which was designated as a "private beach" in the advertisements and was referred to as a "community beach" in the deeds from the developers to the Club, Inc. Some of the plats stated that the developers "hereby dedicate and provide over fifteen (15) miles of ocean shore reserved for the future use and benefit of all lot owners." See Finding 3A. No commercial lots or commercial sites on the beach on the ocean side of the boardwalk were shown on the plats. The owner of each lot in the development had the right to prevent any commercial use of any part of the beach inconsistent with his right to use the entire beach as a private, community beach. See cases in note 24, supra.

The only indication that a structure (other than the boardwalks in front of commercial areas) might be built on or over any part of the beach is the designation of an area with a 250 foot frontage on the beach as a "pier site". See Finding 11(B). The Club, Inc., as the owner of the pier site after February 13, 1956, could have constructed a pier itself and rented out space on the pier for commercial operations, or could have

mission of Maryland v. Teets, 210 Md. 213, 223–225, 123 A.2d 309, 314–315 (1956) ; and cases cited therein.

20. See Hearings on S. 20 and S. 1121 before the Senate Committee on Interior and Insular Affairs, 89th Cong., 1st Sess., at 264 (testimony of attorney for County Commissioners).

21. See Chapman v. Rogan, 222 Md. 12, 18–19, 158 A.2d 626, 629–630 (1960).

22. See Hillshire Development Corp. v. Pachuta, 235 Md. 178, 201 A.2d 1 (1964) ; Klein v. Dove, 205 Md. 285, 107 A.2d 82 (1954) ; Williams Realty Co. v. Robey, 175 Md. 532, 2 A.2d 683 (1938) ; Simon Distr. Corp. v. Civic Assn., 207 Md. 472, 114 A.2d 829 (1955) ; Murrell v. United States, 269 F.2d 458, 462 (5 Cir.

1959), cert. den. 361 U.S. 962, 80 S.Ct. 590, 4 L.Ed.2d 543 (1960) ; Threedy v. Brennan, 131 F.2d 488 (7 Cir. 1942) ; Cassel v. Reeves, 265 S.W.2d 801 (Ky. Ct.App.1954) ; Tuccio v. Lincoln Development Corp., 27 Conn.Sup. 373, 239 A.2d 69, 71–72 (1967).

23. Mayor & City Council of City of Baltimore v. United States, 147 F.2d 786, 790–791 (4 Cir. 1945) ; United States v. Priest Rapids Irr. Dist., 175 F.2d 524, 526, 531–532 (9 Cir. 1949).

24. Williams Realty Co. v. Robey, 175 Md. 532, 2 A.2d 683 (1938) ; Tuccio v. Lincoln Development Corp., 27 Conn.Sup. 373, 239 A.2d 69 (1967) ; McCorquodale v. Keyton, 63 So.2d 906 (Fla.Sup.Ct.1953) ; see Klein v. Dove, 205 Md. 285, 292, 107 A.2d 82 (1954).

leased the area to someone to build and operate such a pier.[25]

The deed from the developers to the Club, Inc., dated February 13, 1956, conveying the servient interest held by the developers subject to the easements referred to above, could not give and was not intended to give to the Club, Inc. any greater rights to use the beach for commercial or other purposes than the developers themselves owned at that time. Any commercial value based upon a possible unanimous consent of the lot holders would be too speculative to support a substantial award.[26]

*Conclusion A.* The right of each lot owner to use the beach as a private, community beach, and to prevent the commercial use of any part of the beach (except the area in front of the 250 ft. pier site), requires a ruling that the servient estate in the beach, subject to the easements, has no more than a nominal value for purposes of condemnation.

*Conclusion B.* The pier site has more than a nominal value for purposes of condemnation.

### The Neponsit Theory

The Trustees and the Corcorans argue, however, that the lot owners as a group, represented by the Trustees of the Liquidation Trust or by other trustees to be appointed by the Court, are entitled to recover more than nominal damages for the taking of the beach, under a theory based upon In re Public Beach, Borough of Queens, City of New York, 269 N.Y. 64, 199 N.E. 5 (1935), usually referred to as the *Neponsit* case. There is, however, an essential difference between the facts of that case and the facts of this case, which makes that decision inapplicable here.

In *Neponsit* all lot owners in the development had an easement to use a private beach similar to the easement enjoyed by all lot owners in our case. The Neponsit Property Owners Association, Inc. (of which all record holders of lots at Neponsit were by that fact members) held title to the private beach subject to that easement. But in *Neponsit* the City did not condemn or seek to acquire the lots owned by the members of the Association. The New York Court noted specifically that "no owner of a dominant tenement, enjoying rights to use the land, has made any claim here for compensation for destruction of an easement upon the land; and since all owners of dominant tenements enjoyed, irrevocably, membership rights, accorded by the appellant, co-extensive with their easements upon the land taken, the easements, for practical purposes, had become merged in the membership rights." 269 N.Y. at 74, 199 N.E. at 9. In our case, on the contrary, the Government has condemned the lots of all lot owners on Assateague, whether or not they ever became members of the Club, Inc.,[27] and each lot owner has a right to recover the value of his appurtenant easement as a part of the value of his lot for condemnation purposes. The lot owner is not left with a lot, shorn of its easement right to use a private beach; his lot and the appurtenant easement are taken together. Without the easement, the individual lots would have had less value. If the Government were required not only (1) to pay each lot owner the value of his lot, including the appurtenant easement to use the private beach, but also (2) to pay the Trustees of the Liquidation Trust or other trustees a sum representing the collective value of the easements of all of the lot owners, the Government would be

---

25. See Finding 11(B) for a reservation to Ackerman, who died before 1968, of the right to approve the location of and plans for the pier.

26. Paragraph 13 of most deeds, quoted in Finding 6, does not apply to the easements of the individual lot owners, dis-

cussed above, but only to the covenants and restrictions in the deeds.

27. The developers themselves, who still own a considerable number of lots, and other corporations which own lots have never been members of the Club, Inc.

paying twice for the same easements.[28] There was no such double payment in *Neponsit*, since no claims were made by any individual lot owners.[29]

### Streets [30]

▉ The designation of streets on plats and the sale and conveyance of lots by reference to such plats raises a presumption of an offer to dedicate the streets to the public.[31] To vest title and ownership in the public, the offer must be accepted.[32] But the rights of purchasers of the lots do not depend on such acceptance; each lot owner has an easement to use the streets.[33]

In this case it is not clear whether the developers intended to dedicate the streets to the public by the plats or intended them to be private community property over which the lot owners held easements to use them as streets. The lots were not sold by reference to streets, but by lot and block numbers. The County did not attempt to accept any possible offer of dedication of the streets until 1963.

In 1956, when the developers had sold 90–95% of the lots, they conveyed the streets to the Club, Inc., "as community property for the mutual use and benefit of all present and future owners of property on Assateague Island. * * *" See Finding 11(B).

In 1963 the County obtained fee simple title to the streets, by causing its attorney to prepare a deed therefor, which was executed by the Club, Inc. The County then surveyed the land and took preliminary steps to construct the streets.[34]

▉ If the intention of the developers was to offer to dedicate the streets to the public and if that offer was not withdrawn by the deed of the streets to the Club, Inc., the action of the County in 1963 amounted to an acceptance of that offer.

▉ If, on the other hand, the intention of the developers was that the streets should be community property over which the lot owners held easements, the deed from the developers to the Club, Inc. in 1956 and the deed from the Club, Inc.

28. This is not a case where, as a practical matter, the Club, Inc. or the Trustees must be allowed to collect for the value of the easements appurtenant to the several lots, for the benefit of some or all of the owners. Cf. United States v. Priest Rapids Irr. Dist., 175 F.2d 524 (9 Cir. 1949), where each property owner was held entitled to recover individually for the value of the irrigation facilities reflected in the value of his land, but the District was held entitled to recover for that part of the value of the power properties represented by the sale of power to a private power company.

29. Moreover, in *Neponsit* the Court said: "The problem would be, of course, different if the nature of the easement rights or of the membership rights were different." 269 N.Y. at 75, 199 N.E. at 9.

30. The term "streets" will be used herein to include "boulevards" and "the projected right of way for a Dual Lane Coastal Highway".

31. Mauck v. Bailey, 247 Md. 434, 442–443, 231 A.2d 685, 690–691 (1967); Hillshire Development Corp. v. Pachuta, 235 Md. 178, 201 A.2d 1 (1964); Shapiro

v. Board of County Commissioners, 219 Md. 298, 149 A.2d 396 (1959); Atlantic Construction Corp. v. Shadburn, 216 Md. 44, 139 A.2d 339 (1958).

32. Mauck v. Bailey, 247 Md. 434, 443, 231 A.2d 685, 691 (1967); United Finance Corp. v. Royal Realty Corp., 172 Md. 138, 191 A.2d 81 (1937).

33. Hillshire Development Corp. v. Pachuta, 235 Md. 178, 201 A.2d 1 (1964); Klein v. Dove, 205 Md. 285, 107 A.2d 82 (1954).

34. No streets or roads were constructed because of a conflict between the policy of the State and the policy of the County with respect to the development of Assateague. Evidence and arguments were offered about this and other matters, such as the litigation in the State courts over the claimed right of the lot owners to install septic tanks, which are immaterial to the issues decided in this opinion. See State Department of Health v. Walker, 238 Md. 512, 209 A.2d 555 (1965). Whether such evidence will be admissible in cases involving the value of lots or other property need not be decided now.

to the County in 1963 effectively conveyed the fee simple title in the streets to the County, as the only effective way, under the evidence, to have the streets constructed and maintained.

*Conclusion C.* In either event, the streets had no more than a nominal value for purposes of condemnation.

### Parks and Parking

On the plats of all sections, except Section A, two or three blocks, each 320′ x 400′, were designated as "Parks". In each instance the blocks designated as "Parks" were entirely surrounded by blocks designated "Commercial". In the 1957 plat of Section A the blocks formerly designated as "Parks" were bisected by a street and designated as "Parking".

The plats do not show whether it was intended to dedicate the parks to the public or to the use of the lot owners as community property, but the evidence as a whole shows that they intended the parks to be community property. The deed of the parks to the Club, Inc. in 1956 treated the parks as community property. See Finding 11(B).

In 1963 the Club, Inc. conveyed to the County fee simple title to all the areas designated as "Parks" or "Parking Areas" except "Central Park", as the only effective way to have the areas maintained as parks.

*Conclusion D.* The areas designated "Parks" and "Parking Area" except "Central Park", have no more than a nominal value for condemnation purposes.

### Central Park

The reason Central Park was not included in the deed to the County is not clear. The developers had conveyed it to the Club, Inc. for a "community park". See Finding 11(B). The plats and advertisements, however, did not give the purchasers of lots as clear a right to prevent the use of the parks for commercial purposes as they gave with respect to the beach. It is not impossible that some profitable commercial use

could be made of Central Park which would not be inconsistent with its use as a community park.

*Conclusion E.* Central Park may have more than a nominal value for condemnation purposes.

### Fuel Dock Site

The deed dated November 26, 1957, from the Bridge Corporation to the Club, Inc., conveyed the area designated "Fuel Dock", to the Club, Inc. in fee simple. There was nothing in the deed to suggest, and the parties did not intend that the legal and equitable interest in the fuel dock and the other properties included in the deed should be separated. The fuel dock did not appear on any plats filed by the developers before 1957, at which time it was owned in fee simple by the Bridge Corporation. Although the Bridge Corporation signed the 1957 amended plat of Section A, there was no dedication of the fuel dock to public use, and the evidence does not show that anyone purchased a lot relying upon any restriction on the use of the fuel dock.

*Conclusion F.* The Fuel Dock Site has more than nominal value for condemnation purposes.

### Town Hall Site

The area marked "Site for Town Hall" on the 1957 amended plat of Section A is located at the westernmost end of the causeway property created by the dredging and filling operations of the Bridge Corporation. That plat was signed by the Bridge Corporation as well as by the developers, but the evidence does not show that anyone purchased a lot relying upon any community use of that area, or that there was any other offer of dedication or enforceable easement with respect thereto. The "Site for Town Hall" was conveyed by the Bridge Corporation to the Club, Inc. in fee simple on July 9, 1958, "specifically for that purpose and park use". See Finding 15.

Even if there was a dedication or an easement for community use, such dedication or easement would not prevent some commercial use of the property.

*Conclusion G.* The Town Hall site has more than a nominal value for condemnation purposes.

### Harbor Site

■ The areas designated as "Harbor Site" on the early plats and as "Public Harbor" and "Harbor Parking" on the 1957 amended plat of Section A were never dedicated to either public or community use, and was never deeded by the developers to the Club, Inc. or to anyone else.

*Conclusion H.* The harbor site has more than a nominal value for condemnation purposes.

### II.

### Who Is Entitled to Collect the Condemnation Awards?

The conclusion that the beach (other than the pier site) and the parks (other than Central Park) have no more than a nominal value for condemnation purposes, does not render moot the question who is entitled to collect the condemnation awards, because the pier site, Central Park, the fuel dock, the town hall site, and the harbor site, have or may have more than a nominal value for condemnation purposes.

### The Pier Site and Central Park

The question presented is whether the deed of February 13, 1956, from Ocean Beach, Inc., one of the developers, to the Club, Inc., conveyed whatever title and interest the developer then owned in the pier site and Central Park (along with the other parks, the beach and the streets) [35] to the Club, Inc.—

(a) for its corporate purposes (as the Trustees of the Liquidation Trust contend), or

(b) as trustee for the property owners (as the Corcorans and the developers contend).

The developers and the Corcorans offered evidence that the developers sent to

Thomas J. Caracuzzo, an attorney and an officer of a title company, memoranda prepared by Walker [36] which contained descriptions of the properties to be conveyed to the Club, Inc. The developers requested Caracuzzo to prepare two deeds conveying to the Club, Inc. the properties so described "together with all improvements thereon and accretions thereto, forever, in fee simple, to be held in trust for all present and future owners of record of property situated on Assateague Island, in Worcester County, Maryland (who are recognized as bona fide members in good standing), of Ocean Beach Club, Inc., a Maryland corporation, or its successor or successors, said property hereby conveyed, to be held as community ocean beach property, for the mutual use and benefit of all such recognized and qualified property owners of record, and their heirs and assigns, subject, however, to acceptance of such heirs and assigns as bona fide members in good standing of Ocean Beach Club, Inc., a Maryland corporation, or its successor or successors."

Caracuzzo testified that after receiving the memoranda he must have spoken to Ackerman, the president of the developers, although he has no recollection of any such conversation. In any event he prepared two deeds, which, except for the addition of one piece of land, were the same as the deeds actually executed by the developers, as set out in Finding 11(B). No testimony was given by Caracuzzo or anyone else as to why the words "in trust" were deleted from the deeds prepared by Caracuzzo and the deeds executed by the developers, or as to why all reference to "members in good standing" of the Club, Inc. was deleted. The language used in the actual deeds of February 13, 1956, is set out in Finding 11(B).

The foregoing evidence was objected to by the Government and by the Trustees, but the Trustees withdrew their objection. The Court has concluded that

---

35. Subject to the easements of the individual lot owners and any rights the public might have. See Finding 11(B).

36. As to Walker's connection see, Opinion No. 1 herein, 306 F.Supp. 138, 141–142, 147–150.

the evidence should be admitted, and finds that the deletions were made intentionally and not accidentally.

■ The Maryland law with respect to the creation of trusts is set out in the cases cited.[37] The words "for the benefit of" may imply a trust, but they do not necessarily do so. The intention of the settlor is often said to be controlling.

The evidence as a whole shows that when the developers executed and delivered the deeds of February 13, 1956, they intended the land to be held by the Club, Inc. for the benefit of all owners of lots in the two subdivisions.

When the Club, Inc. was incorporated in March 1955, its Articles of Incorporation provided: "All persons who have acquired title to land or have contracted to acquire title to land from either Ocean Beach, Inc. or South Ocean Beach, Inc. as of the date of filing of these Articles of Incorporation shall constitute the original members of the Corporation * * *." So, when the developers decided around July 1955 to shift their maintenance responsibilities to the newly organized Club, Inc., see Finding 11(A), all individuals who owned lots which had been purchased from the developers were considered to be members of the Club, Inc. Despite the terse corporate purpose recited in the Articles of Incorporation, everyone knew and intended that the principal purpose of the Club was to maintain the community areas for the benefit of all lot owners in the two subdivisions.

It was also intended that only those who paid (1) the annual maintenance fees specified in the deeds to the purchasers of lots, and (2) the dues and assessments levied by the Club, Inc. should be considered members in good standing entitled to vote in the election of members of the Board of Governors and on questions of policy which might be submitted to vote of the members from time to time.

So, if the deeds be construed to be deeds to the Club, Inc. for its corporate purposes, those purposes would include the maintenance of the beach and other community areas for the benefit of the property owners, primarily the owners of lots in the subdivisions, but, incidentally, the owners of other property on Assateague who might use the roads to come to the commercial establishments or to visit their friends in the subdivisions. Such construction would be in line with the Maryland laws as set out in a number of cases, of which Baltzell v. Church Home, 110 Md. 244, 73 A. 151 (1909), is typical. In that case the Court said: "The cases in this state fully establish the doctrine, that when property is left to a corporation for such uses as are within the scope of its corporate purposes, or the objects to which the gift is to be applied are such as the corporation was organized for, then such gift cannot be declared invalid on the ground that it was in trust for indefinite objects, or in conflict with the rule against perpetuities, unless the intention to create a trust be clear." 110 Md. at 270, 73 A. at 156. See also Columbia Building Co. v. Cemetery of the Holy Cross, 155 Md. 221, 229, 141 A. 525, 528 (1928); Sands v. Church of the Ascension etc., 181 Md. 536, 30 A.2d 771 (1943).

This was evidently the view of the persons who prepared the Liquidation Trust Agreement, although they sought to give special advantages to those who had kept their payments current. The assumption by this Court of jurisdiction over the administration of the Liquidation Trust, however, will enable the Court to require (1) that equitable principles be followed in the administration of the trust and the distribution of the proceeds of any awards and other funds received and to be received, and (2) that proper charges or credits be allowed to the lot owners,

---

37. Sieling v. Sieling, 151 Md. 536, 135 A. 376 (1926); Dougherty v. Dougherty, 175 Md. 441, 2 A.2d 433 (1938); Hoffmann v. County Title Company, 240 Md. 199, 213 A.2d 563 (1965).; Levin v. Security Financial, 246 Md. 712, 230 A.2d 93 (1967).

depending upon whether or not they have paid their share of the expenses of preserving the property before the condemnation.[38]

If the deeds were construed to be deeds to the Club, Inc. as trustee of an express trust, various problems would arise with respect to the identity of the beneficiaries, the rule against perpetuities and the capacity of the Club, Inc. to act as trustee of the claimed trust.

The developers contend that the deeds created a trust for the benefit of the property owners, that the purpose of that trust failed when the properties were condemned by the Government, and that the Club, Inc. thereafter held the property as trustee of a resulting trust in favor of the developers.

■■■■ Even if those deeds had created a trust, the developers' argument would not be supported by the facts and the law. There is no evidence that the developers intended that the beach and other property conveyed by the February 13, 1956 deeds were to revert to the grantors under any circumstances. Moreover the developers' contention runs counter to the authorities which hold that condemnation does not work a reverter.[39] The situation immediately before the filing of the condemnation suit controls, not the situation created by the filing of the condemnation suit.[40]

Moreover, it would be grossly inequitable to allow the developers, who saddled the upkeep of the properties on the Club, Inc. to come in now and claim whatever money may be allowed as condemnation awards for the property conveyed by the February 13, 1956 deeds.

■■■ *Conclusion I.* The Court concludes that the February 13, 1956 deeds did not create a specific trust, but conveyed whatever interest the developers owned in the properties conveyed,[41] (subject to the easements of the lot owners) to the Club, Inc., in fee simple, to be used for its corporate purposes, stated in the deeds.

■■■ *Conclusion J.* Any awards for the pier site and Central Park should be made to the Trustees of the Liquidation Trust, to be distributed by them under the supervision of the Court to insure that all lot owners receive their pro rata share with due allowance for proper credits and charges.

*Conclusion K.* The developers are not entitled to collect the condemnation award for any properties conveyed by the February 13, 1956 deeds.

### Fuel Dock

The deed of November 26, 1967, from the Bridge Corporation to the Club, Inc. conveyed the full legal and equitable title to the Fuel Dock, as well as the lots in Blocks 510 and 410 and some lots in Block 310 (see Finding 14) to the Club, Inc. in fee simple.

*Conclusion L.* The Trustees of the Liquidation Trust are entitled to collect the award for the Fuel Dock.[42]

### Town Hall Site

The deed of July 9, 1958, did not make the Club, Inc. a trustee for anyone with

---

38. Such expenses as maintaining a club house in Washington might not be chargeable against property owners who had not maintained membership in the Club.

39. State of Texas v. Harris County Houston Ship C. N. Dist., 158 F.2d 861, 864 (5 Cir. 1946) ; People of Puerto Rico v. United States, 132 F.2d 220, 221–222 (1 Cir. 1942), cert. den. 319 U.S. 752, 63 S.Ct. 1165, 87 L.Ed. 1706 (1943) ; United States v. 1846.77 Acres of Land, Etc., 48 F.Supp. 721 (W.D.Ky.1942) ; United States v. 1119.15 Acres of Land, 44 F.Supp. 449 (E.D.Ill.1942).

40. See State of Texas v. Harris County Houston Ship C. N. Dist., 158 F.2d 861 (5 Cir. 1946) ; Woodville, Okl. v. United States, 152 F.2d 735 (10 Cir.), cert. den. 328 U.S. 842, 66 S.Ct. 1021, 90 L. Ed. 1617 (1946).

41. I. e. the beach, the pier site, the parks and parking and the streets.

42. The persons who will be entitled to share in the ultimate distribution of the amount so collected, and the charges which may properly be made against it, will be determined by this Court in subsequent proceedings.

respect to the Town Hall Site, although it limited the use which the Club, Inc. could make of the property. See Finding 15, and Discussion in I above.

*Conclusion M.* The Trustees of the Liquidation Trust are entitled to recover the award for the Town Hall Site. See note 42.

### Harbor Site

*Conclusion N.* Ocean Beach, Inc. is entitled to recover the award for the Harbor Site. See Discussion under I, above.